ESPINOSA, J.
The defendant, Jessie Campbell III, appeals, following a jury trial, from the judgment of conviction of capital felony in violation of General Statutes (Rev. to 1999) § 53a-54b (8), two counts of murder in violation of General Statutes § 53a-54a (a), attempt to commit murder in violation of
General Statutes §§ 53a-49 (a) (2) and 53a-54a (a), assault in the first degree in violation of General Statutes § 53a-59 (a) (1), and criminal possession of a pistol or revolver in violation of General Statutes (Rev. to 1999) § 53a-217c (a) (1).[1] He was subsequently sentenced to death plus forty-five years of incarceration. On appeal to this court, the defendant has raised a total of thirty-five claims, including twenty-one claims pertaining to the penalty phase. Prior to oral argument, this court directed the parties to address an additional issue: whether the defendant's penalty phase challenges had been rendered moot by this court's decision in State v. Santiago , 318 Conn. 1, 122 A.3d 1 (2015), which abolished the death penalty. We conclude that the defendant's claims challenging the penalty phase are not yet ripe. We address his remaining claims and affirm the judgment of conviction.
The jury reasonably could have found the following relevant facts. On August 26, 2000, at 131 Sargeant Street in Hartford, a shooting left two victims dead and a third victim gravely injured. That day, after completing her shift working as a line cook at the Olive Garden in Manchester, Carolyn Privette (Carolyn) took a bus to her home at 269 Sargeant Street. She arrived shortly after 9 p.m., ate dinner, and then watched television with her husband and children. Just before 10 p.m., she decided to take a short walk to visit her niece, Desiree Privette (Desiree), who lived at 131 Sargeant Street. When she arrived at Desiree's home a few minutes later, the defendant, who had been there for approximately one hour, was standing and talking with L,[2] just inside the entrance gate to the front yard. Carolyn had known twenty year old L since L had been a child. She recognized the defendant as L's boyfriend and the father of L's young son. Desiree, *895 who had not been expecting Carolyn, was at the house next door. L called for Desiree, who came over and greeted Carolyn with a hug. Carolyn and Desiree sat on the steps of the front porch, talking about their day, while the defendant and L continued their conversation at the front gate. Carolyn specifically recalled that L and the defendant were not speaking in raised voices-to all appearances, their conversation seemed to be an ordinary one.
After a short time, Desiree announced that she was going upstairs. Carolyn indicated that she would join her and asked L, who sometimes stayed overnight at Desiree's house, whether she would like to come with them. L took a few steps toward Carolyn and Desiree, stopped near a large bush by the front steps, and declined, stating that the defendant wished to continue talking. In the meantime, the defendant had also moved closer to the steps and was standing near L. As Carolyn and Desiree were beginning to stand up from the porch steps, L bent down as though to tie one of her shoes. At that moment, the defendant pulled a silver handgun out of his pocket, placed it to L's head and shot her. She tumbled over, landing partially under the bush by the stairs. The other two women began screaming and tried to escape, but the defendant ran at them with the gun. He next shot Desiree, who fell to the ground on the side of the walkway that led to the front steps. He then shot Carolyn, who was still on the steps. She instinctively raised her right hand up in front of her-the bullet went through her hand and hit her right arm. She fell, but started crawling on her hands and knees across the porch toward the front door. She "felt" something that prompted her to look back over her shoulder. She saw the defendant standing over her, looking at her with a blank expression that she described as one the likes of which she had never seen before. He then shot her again, this time in the back of the head. Lying on the porch, Carolyn remained still, closed her eyes, held her breath and pretended to be dead, afraid that he would shoot her again. The defendant shook her to see if she was dead, then walked over to Desiree, who had not moved after she had fallen to the ground, and shot her a second time. The defendant then pulled a hood over his head and walked away, down a path along the side of the house.
First responders arrived shortly before 10:30 p.m., within minutes after the shooting-fewer than thirty minutes after Carolyn had left her home to visit Desiree. Officers from the Hartford Police Department (Hartford police) at the scene could smell gunpowder in the air. Desiree was pronounced dead at the scene. The autopsy later revealed that she had suffered four areas of trauma from the gunshots, one wound to the chin, a through and through wound to her right forearm, another through and through wound to her right breast, and one to the right side of her head. The autopsy report concluded that the cause of death was the gunshot wound to her head.
After quickly assessing the three victims and ascertaining that Desiree was not breathing, paramedics and emergency medical technicians at the scene focused their attention on L and Carolyn. Due to safety concerns for both the victims and the responders, the goal was to stabilize the victims as quickly as possible and remove them from the scene. L was breathing in agonal gasps, alerting responders that she was close to death. As soon as they secured her airway, they placed her in an ambulance and transported her to Saint Francis Hospital and Medical Center (hospital). Chassidy Milner, a paramedic, attended to Carolyn. Milner and her partner removed Carolyn from the scene after performing a quick assessment. Milner *896 rode in the rear of the ambulance beside Carolyn. When she asked Carolyn what her name was, Carolyn responded, "Jessie." Carolyn later explained that she knew she needed to tell the authorities who had "done that to those girls," before her own death, which she believed was imminent.
L fell into a coma and was taken off life support the next morning. The autopsy revealed that the cause of death was a gunshot wound to the right parietal area of her head, an area extending from the ear to the crown. Carolyn underwent surgery and survived, eventually testifying at the defendant's trial. Her injuries, however, were significant and long-term. She has substantial scarring on her head and right hand and she no longer has peripheral vision out of her right eye. After she was released from the hospital, she was placed in rehabilitative care, where she had to relearn how to use all of her motor skills, including how to walk again. She continues to suffer from severe, frequent headaches, muscle spasms and insomnia.
At approximately 11 p.m. on the night of the shooting, the defendant arrived at the Hartford home of his girlfriend, Jermyra Cortez. Cortez was inside when her cousin told her that the defendant was in the backyard. When she went outside to see him, the defendant was removing all of his clothes, except for his underwear and his Timberland boots, and was starting a fire to burn the clothing. He was sweating and appeared "scared, like he'd done something he ain't have no business doing." Cortez asked him if he had been smoking "dust."[3] The defendant responded that he had not. She described his eyes as "wide open" and "staring." She asked him why he was burning his clothes, where he had been and what he had done, but he did not answer the questions and instead repeatedly shushed her. After ten minutes, Cortez left the defendant in the backyard and went to a nightclub with her mother.
At approximately 12:30 a.m., the defendant and his mother went to the home of J, L's mother. J was not home, but T, L's sister, was there, babysitting the son of L and the defendant. The defendant's mother left shortly after T answered the door. The defendant remained and asked T if she had seen L. She replied that she had not. The defendant asked T if she would braid his hair because he was planning to leave town the next day, but she declined and went back to bed.
After T went back to bed, the defendant took his son with him to the hospital, where L and Carolyn were still being treated. He arrived at the hospital sometime around 1 a.m. and went to the area outside the main entrance to the emergency department. He spoke to two nursing supervisors and asked them to tell J, who was working at the hospital that night, that he wanted to speak to her. He told them that he was J's son, and that his name was "Joshua." As he spoke to them, he was holding his sleeping son in his arms. He claimed that he wanted to speak to J because the "baby" was cold. When the nurses found J and brought her to speak to him, however, the defendant was no longer there. After leaving the hospital, the defendant returned his son to J's home.
Sometime after 1 a.m., the defendant went to the home of his friend, Heather Bolling, at Oakland Terrace in Hartford. Bolling was getting ready to go to a nightclub when the defendant arrived. She described the defendant as appearing "out of it" and "scared." He was wearing a jacket that appeared to be too small for him-it did not appear to be his. When she attempted to turn a light on, he told her to turn it off, and then, according to Bolling, *897 he stated that he had "shot somebody or somebody got shot." He also told her that he had just come from the hospital where he had gone to see if the person he had shot was dead. Using Bolling's cell phone, the defendant called his parents to ask for his grandmother's phone number. He then called his grandmother, who lived in Kalamazoo, Michigan.
Bolling went out, leaving the defendant in her home alone, but she returned after less than one-half hour because the club was not open that night. When she returned, she found the defendant in her bed, under the covers and crying. She described his appearance as "weird" and "bugged out." The defendant asked her what she would do if her son's father shot her and two of her friends-would she get revenge or call the police? Bolling responded that she would seek revenge. Later that morning, when Bolling read about the triple shooting in a newspaper, she brought the paper to the defendant and asked him if he did it. He denied it, but Bolling asked him to leave. He called his father, who came to pick him up at approximately 7 a.m. Bolling subsequently called the police.
Kanika Ramsey saw the defendant on Sunday, August 27, 2000, riding past her house on a bicycle. Ramsey, who was in a relationship with the defendant, lived in Windsor, in the house next to the defendant's grandfather. After she had seen him on the bicycle, the defendant phoned her and asked her to meet him outside. She went to his grandfather's house, and the defendant asked her if she had heard what happened. Ramsey responded that she had heard, and asked the defendant "who could have done this." The defendant said he did not know. His grandfather then called to him and said something to him that Ramsey could not hear. Immediately after hearing what his grandfather said, the defendant told Ramsey that he had to leave.
Two days later, the Hartford police received a tip that the defendant was in Kalamazoo, Michigan. They obtained a warrant for his arrest, and he was apprehended that evening at the home of his grandmother, Lavel Campbell, and returned to Connecticut.
The defendant waived a probable cause hearing. Following a jury trial, he was convicted on all six counts of the amended information, which charged him with capital felony in violation of § 53a-54b (8), on the ground that he murdered L and Desiree at the same time or in the course of a single transaction, two counts of murder in violation of § 53a-54a (a), attempt to commit murder in violation of §§ 53a-49 (a) (2) and 53a-54a (a), assault in the first degree in violation of § 53a-59 (a) (1), and criminal possession of a pistol or revolver in violation of § 53a-217c (a) (1). The state alleged two aggravating factors in support of the death sentence: (1) in committing the capital felony, the defendant knowingly created a grave risk of death to another person, Carolyn; and (2) the defendant committed the offense in an especially heinous, cruel or depraved manner, in that he inflicted extreme psychological pain or suffering on Desiree, and was callous or indifferent to the extreme psychological pain or suffering that his conduct inflicted on Desiree. The jury found that the state had proven the first aggravating factor beyond a reasonable doubt. The jury also found, however, that the defendant had proven at least one nonstatutory mitigating factor. Because the jury was unable to agree whether the aggravating factor outweighed the mitigating factor, the trial court granted the state's motion for a mistrial and denied the defendant's motion to impose a life sentence.
At the second penalty hearing before a different jury, the state alleged a single aggravating factor: in committing the capital felony, the defendant knowingly created *898 a grave risk of death to another person, Carolyn. At the end of the second penalty hearing, the jurors returned a special verdict finding that the state had proven the aggravating factor beyond a reasonable doubt, one or more jurors had found that the defendant had proven at least one nonstatutory mitigating factor by a preponderance of the evidence, all jurors were persuaded, beyond a reasonable doubt, that the aggravating factor outweighed the mitigating factors, and death was the appropriate punishment. The trial court subsequently imposed a sentence of death on the capital felony count, twenty years incarceration on the attempt to commit murder count, twenty years incarceration on the assault in the first degree count, and five years on the criminal possession of a pistol or revolver count, all terms of incarceration to run consecutively. This appeal followed. Additional facts will be set forth as necessary.
I
PENALTY PHASE CHALLENGES
After the defendant had been sentenced to death, this court abolished the death penalty. See State v. Santiago , supra, 318 Conn. 139-140, 122 A.3d 1. Prior to oral argument, we directed the parties to "be prepared to address at oral argument why the defendant's claims of error in the penalty phase of the proceedings should not be dismissed as moot in light of [ Santiago ] and State v. Peeler , 321 Conn. 375, [140 A.3d 811] (2016)." The defendant claims that the penalty phase issues are not moot because he will suffer collateral consequences if he is not allowed to challenge his prior death sentence. He contends that, unless he prevails on at least one of his penalty phase challenges, if this court affirms his conviction and remands the case to the trial court for resentencing, General Statutes § 18-10b, which governs the placement of those convicted of capital felony or murder with special circumstances, may require that he be housed in administrative segregation, which he contends constitutes an enhanced punishment.[4] The state responds that the question is controlled by this court's decision in Peeler , in which this court concluded that Santiago rendered the defendant's penalty phase challenges moot.
*899 State v. Peeler , supra, at 377, 140 A.3d 811. In the alternative, the state contends that the defendant's claim relates to conditions of confinement, which have not yet been settled, as the defendant has not yet been resentenced. Additionally, there have been no factual findings as to how, if at all, the defendant's confinement, after resentencing, would differ from those of any inmate who is similarly situated. Accordingly, the state argues, this court lacks any record of the facts that would be necessary to enable it to determine whether the defendant may be entitled to relief. We agree with the state's alternative claim and conclude that the defendant's penalty phase claims are not ripe. Moreover, we also conclude that, because the defendant's argument centers on a potential challenge to conditions of confinement, the proper vehicle for those claims is a petition for a writ of habeas corpus. Because we conclude that the defendant's penalty phase claims are not ripe, we do not resolve whether they have been rendered moot by Santiago .[5]
The doctrines of mootness and ripeness both implicate justiciability. Janulawicz v. Commissioner of Correction , 310 Conn. 265, 270, 77 A.3d 113 (2013). "Mootness implicates this court's subject matter jurisdiction, raising a question of law over which we exercise plenary review.... An issue is moot when the court can no longer grant any practical relief." (Citation omitted; internal quotation marks omitted.) Burton v. Commissioner of Environmental Protection , 323 Conn. 668, 677, 150 A.3d 666 (2016). "[T]he rationale behind the ripeness requirement is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements .... Accordingly, in determining whether a case is ripe, a ... court must be satisfied that the case before [it] does not present a hypothetical injury or a claim contingent [on] some event that has not and indeed may never transpire." (Internal quotation marks omitted.) Janulawicz v. Commissioner of Correction , supra, at 271, 77 A.3d 113.
For several reasons, the record is insufficient to resolve the defendant's claim that he will be subjected to more severe conditions of confinement unless this court resolves at least one of his penalty phase claims in his favor. The defendant conceded at oral argument that he has not yet been resentenced. Until that happens, we cannot say with certainty what the defendant's conditions of confinement may be. The defendant relies on § 18-10b (a) (2), which applies to an inmate "if ... the inmate is in the custody of *900 the Commissioner of Correction for a capital felony committed prior to April 25, 2012, under the provisions of section 53a-54b in effect prior to April 25, 2012, for which a sentence of death is imposed in accordance with section 53a-46a and such inmate's sentence is (A) reduced to a sentence of life imprisonment without the possibility of release by a court of competent jurisdiction ...." Following resentencing, the Commissioner of Correction (commissioner) will be required to determine whether the requirements of § 18-10b apply to the defendant. If the commissioner so determines, then it is unclear to what extent the requirements of § 18-10b would result in different conditions of confinement for the defendant. Specifically, we note that the statute requires the commissioner to "establish a reclassification process" that shall include "an assessment of the risk an inmate described in subsection (a) of this section poses to staff and other inmates, and an assessment of whether such risk requires the inmate's placement in administrative segregation or protective custody...." General Statutes § 18-10b (b). There is no evidence in the record as to whether the commissioner has established a reclassification process pursuant to § 18-10b, or, if such a process has been established, of what it is comprised. The commissioner enjoys broad discretion in assigning classifications to inmates. See, e.g.,
Anthony A. v. Commissioner of Correction , 326 Conn. 668, 675, 166 A.3d 614 (2017) (noting commissioner's broad discretion in context of due process analysis); Wheway v. Warden , 215 Conn. 418, 431, 576 A.2d 494 (1990) (same). Consistent with that broad level of discretion, the statute appears to contemplate a highly individualized assessment before an inmate is reclassified. It is uncertain at this time, therefore, what the defendant's eventual conditions of confinement will be.
Additionally, there have been no factual findings as to what procedures and rules would otherwise apply to the defendant, findings that would be necessary to determine whether he has been or could be prejudiced by his prior death sentence. For instance, the record is devoid of any information as to whether there are other inmates who are similarly situated to the defendant and, if so, under what conditions they are confined and how those conditions differ, if at all, from the defendant's conditions of confinement. The defendant asserts that, because § 18-10b requires that inmates falling under its purview initially must be placed "on special circumstances high security status" and housed "in administrative segregation," his conditions of confinement will differ from inmates who are similarly situated. At oral argument, the defendant alluded to Eduardo Santiago, the defendant in State v. Santiago , supra, 318 Conn. at 1, 122 A.3d 1, and suggested that Santiago's conditions of confinement will be superior to those of the defendant in the present case. There is no evidence in the record, however, as to what Santiago's conditions of confinement are, nor is there a finding that Santiago is an inmate similarly situated to the defendant. There is no evidence in the record regarding any procedures followed by the Department of Correction in classifying inmates for purposes of determining the appropriate conditions of confinement.
It is well established that the proper vehicle by which a defendant may challenge his conditions of confinement is a petition for a writ of habeas corpus. See, e.g., State v. Anderson , 319 Conn. 288, 325, 127 A.3d 100 (2015). The present case illustrates perfectly why a habeas petition is the proper vehicle. In the habeas court, the defendant will have the opportunity to present any and all evidence that is relevant to his claim. That court is empowered *901 to make factual findings on that evidence. This court is not. Accordingly, the defendant's appeal is dismissed with respect to his claims challenging the penalty phase and the sentence of death. See footnote 5 of this opinion.
II
RIGHT TO BE PRESENT DURING CRITICAL STAGES OF TRIAL
The defendant claims that he was denied his due process right to be present during critical stages of the trial, guaranteed by the fourteenth amendment to the United States constitution and article first, §§ 8 and 9, of the Connecticut constitution. Specifically, the defendant claims that he was guaranteed the right to be present at two unrecorded pretrial scheduling conferences, one held on November 25, 2003, and a second held on December 23, 2003.[6] The defendant contends that, because his attorneys had not had adequate time to prepare his defense, the scheduling conferences implicated his right to effective representation by fully prepared counsel. Therefore, he contends, those conferences were critical stages of his prosecution. The defendant has cited no authority to support his claim that scheduling conferences constitute critical stages of the prosecution. Indeed, Practice Book § 44-10 (a) (3) provides in relevant part: "Unless otherwise ordered by the judicial authority, a defendant need not be present ... at any conference , except a disposition conference pursuant to Section 39-13." (Emphasis added.) Our rules of practice, therefore, establish that, in the absence of a judicial order to the contrary, the general rule is that a defendant is neither required nor entitled to be present at a scheduling conference. The defendant contends that his counsel's alleged lack of preparedness transformed those conferences into critical stages, thus entitling him to be present. We disagree.
"[A] criminal defendant has a constitutional right to be present at all critical stages of his or her prosecution.... Indeed, [a] defendant's right to be present ... is scarcely less important to the accused than the right of trial itself.... Although the constitutional right to be present is rooted to a large extent in the confrontation clause of the sixth amendment, courts have recognized that this right is protected by the due process clause in situations when the defendant is not actually confronting witnesses or evidence against him.... In judging whether a particular segment of a criminal proceeding constitutes a critical stage of a defendant's prosecution, courts have evaluated the extent to which a fair and just hearing would be thwarted by [the defendant's] absence or whether his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." (Citations omitted; internal quotation marks omitted.) State v. Lopez , 271 Conn. 724, 732, 859 A.2d 898 (2004).
The defendant has advanced only one argument in support of his contention that his presence at the scheduling conference had a reasonably substantial relation to his opportunity to defend against the charges. Namely, he claims that he was never offered an explanation of the trial court's reasons for setting the trial schedule, despite the position of defense counsel that the schedule did not afford them sufficient time to prepare. We first observe that the defendant is incorrect in stating that the trial court provided no reasons for setting the specific trial schedule. As we describe in part III of this opinion, when the court denied the defendant's motions *902 for continuances, it offered a detailed explanation in support of its scheduling determinations. Even if the defendant were correct, however, he offers no explanation as to how knowing the trial court's reasons for setting the schedule would have allowed him a fuller opportunity to defend his case. The scheduling conferences were not critical stages of the defendant's prosecution.
III
DENIAL OF CONTINUANCES
The defendant claims that the trial court's denial of his motions seeking continuances deprived him of his due process right to a fair trial.[7] He argues that, in arriving at its ruling, the court focused only on the age of the case and did not accord sufficient weight to other factors. He further claims that the trial court's denial of those motions prejudiced his defense by not allowing his counsel sufficient time to persuade the defendant to discuss with them the events leading to his arrest, to develop a theory of the defense, and to prepare for effective and informed voir dire. According to the defendant, the denial of continuances forced his counsel to proceed despite being "unprepared," with the result that they were *903 filing motions and preparing witnesses at the last minute. We conclude that the trial court did not abuse its discretion in denying the continuances.
The record reveals the following facts relevant to our resolution of this claim. The defendant was arraigned on September 5, 2000, at which time the court appointed Attorney David G. E. Smith of the Division of Public Defender Services (public defender's office) to represent him. One week later, Attorney Ronald Gold of the Office of the Chief Public Defender also filed an appearance. The defendant filed his first motion for a continuance on January 5, 2004, requesting that jury selection, which had been scheduled to start on that day, be postponed until March 1, 2004. In support of the motion, he claimed that, because of their respective caseloads, trial schedules and other duties, Smith and Gold had had insufficient time to work together in preparation for the defendant's trial.
Specifically, the motion represented that Gold was defense counsel in the case of Robert Courchesne; see State v. Courchesne , 296 Conn. 622, 998 A.2d 1 (2010) ; which had concluded with a jury recommendation of a death sentence on December 17, 2003, nineteen days prior to the proposed January 5, 2004 start date for jury selection in the defendant's case. The defendant submitted that "nineteen (19) days between a verdict after a death penalty hearing and the start of jury selection in another death penalty trial does not allow counsel to recover both physically and emotionally from the first trial and to effectively prepare for the next trial." The defendant also emphasized that Gold's work on Courchesne's case was not yet finished-postverdict motions were due on January 12, 2004, and sentencing was scheduled for January 15, 2004. Gold also was counsel in two other pending capital cases. As for Smith, in 2003, he had served as counsel in five cases scheduled for jury trials, two of which were tried to verdict. Smith had served as counsel in six additional murder cases in 2003, including two capital felony cases.
During the hearing on the defendant's motion, Gold argued that the continuance was necessary to avoid prejudice to the defendant because he and Smith had not had the opportunity to confer regarding defense strategy. The state objected to the motion, reminding the court that the case had been pending for three and one-half years and that the state could potentially be prejudiced by further delay if witnesses were to become unavailable. Several family members of the victims testified that they also opposed a continuance, emphasizing to the court their long wait and need for closure. L's father testified regarding his family's need to begin healing.
In its questions to Gold during the hearing, the court called into question the legitimacy of the reasons offered by Gold and Smith in support of the motion, stating its recollection that Judge Elliot N. Solomon, who was the presiding judge at the time, had informed the court that he had spoken with Gold during the summer of 2003 regarding the present case. According to the court, Judge Solomon stated that he had instructed Gold that he should use a hiatus in the Courchesne case between the guilt and penalty phases, from June until September, to begin preparing for this case. The court also expressed skepticism as to whether the defendant had established prejudice, asking Gold whether there were any material witnesses who had not been interviewed, any experts who had not responded, or any physical evidence that had not yet been tested. Gold did not respond affirmatively to any of those questions. The court further observed that the legal issues that would be involved in the case *904 would pose no special problems for Gold, who was an expert in the area of death penalty law.
The trial court issued its ruling from the bench, granting in part the motion for continuance, extending the start of jury selection by fifteen days to January 20, 2004, and delaying the start of evidence by one week. The court grounded its partial denial of the continuance on the length of time that had already passed since the arraignment, the court's view that the case was not factually complex, the approaching, busy summer season and its likely effect on juror availability, as well as staffing shortages and parking issues at the court. The court rejected defense counsel's claim that they had not had sufficient time to prepare the case for both the guilt and penalty phases because, in the court's view, preparation for the penalty phase was a "separate issue."
On Monday, January 26, 2004, the defendant orally requested a second continuance, because Gold's mother was dying and he was unable to be present in court. Although Smith was able to participate in voir dire, he explained to the court that, in compliance with the recommended guidelines of the American Bar Association (A.B.A.) for the defense of death penalty cases, the policy of the public defender's office was that, at all times during representation of a defendant in a capital case, two defense counsel should be present.[8] Accordingly, the defendant requested that jury selection be paused until Gold was able to participate. The court did not question that the public defender's office had such a policy, but did take issue with the public defender's interpretation of the A.B.A. standards, which the court read to require only that the defense team should consist of two attorneys, not that those two attorneys must both be present in court at all proceedings. The court indicated that it would not hold jury selection that day, and also observed that no jury selection had been scheduled for Tuesday, January 27. The court further observed that weather forecasts predicted a snowstorm on Wednesday, but the court stated that, if the weather did not force the state courts to close, jury selection would go forward that day. Because of the storm, the chief court administrator ordered that jurors were not to be called in on that Wednesday.
The court learned on Thursday morning that Gold's mother had died the previous night. The defendant renewed his oral motion for a continuance until Gold was available. The court denied the motion, stating that it had already "lost" three days of voir dire that week and that it would delay jury selection no further. Jury selection proceeded that day without Gold. On Friday, January 30, 2004, Smith renewed his request for a continuance until Monday, February 2, 2004, explaining that, because *905 Gold was attending his mother's funeral, he would again be unable to be present for jury selection. The court denied the motion, observing that Smith was present and qualified to handle jury selection on his own.
We first set forth the applicable standard of review for the defendant's claim that the court improperly denied the continuances. "There is no question but that the matter of a continuance is traditionally within the discretion of the trial judge which will not be disturbed absent a clear abuse." (Internal quotation marks omitted.) State v. Williams , 200 Conn. 310, 320, 511 A.2d 1000 (1986). "A reviewing court is bound by the principle that [e]very reasonable presumption in favor of the proper exercise of the trial court's discretion will be made.... Our role as an appellate court is not to substitute our judgment for that of a trial court that has chosen one of many reasonable alternatives.... Therefore, on appeal, we ... must determine whether the trial court's decision denying the request for a continuance was arbitrary or unreasonabl[e]." (Internal quotation marks omitted.) State v. Breton , 264 Conn. 327, 356-57, 824 A.2d 778, cert. denied, 540 U.S. 1055, 124 S.Ct. 819, 157 L.Ed. 2d 708 (2003).
"We have recognized that the factors to be considered by a trial court in ruling on a motion for a continuance include the likely length of the delay ... the impact of delay on the litigants, witnesses, opposing counsel and the court ... the perceived legitimacy of the reasons proffered in support of the request ... [and] the likelihood that the denial would substantially impair the defendant's ability to defend himself .... There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." (Citation omitted; internal quotation marks omitted.) Id., at 358, 824 A.2d 778.
As to the trial court's denial of the defendant's first motion for a continuance, the record demonstrates that the court was well within its discretion to partially deny the motion. It is significant that the court did allow the defendant a partial extension-fifteen days for jury selection, and a one week delay in the start of evidence. Moreover, the court relied on numerous factors in arriving at its ruling. It considered the age of the case, certainly, but also considered the effect of a delay on juror availability as well as the possible negative consequences to the state. The court appears to have accorded significant weight to its doubts concerning the legitimacy of the proffered reasons for the request for more time, noting that Judge Solomon had indicated that he informed Gold of his expectation that Gold would use the hiatus in the Courchesne case to begin working on the present case, and observing both that the case was an old one and that Gold was an expert in death penalty cases. The court also properly took account of the stated opposition of the family members of victims, and considered staffing and parking limitations at the courthouse. When the court questioned defense counsel, they failed to identify any specific area in which they were unprepared to go forward, identifying no outstanding issues pertaining to evidence or material or expert witnesses. In summary, the court properly considered the relevant factors and based its ruling on its assessment of those factors.
As to the court's denial of the defendant's second motion for what would have been a two day continuance due to the death of Gold's mother, even if we were to conclude that the ruling constituted an abuse of discretion, the defendant's claim *906 would fail because he has not established any harm on the basis of that denial. The only harm that the defendant alleges based on the denial of his second motion for a continuance is Smith's acceptance of two jurors on those days, whose impanelling the defendant now challenges. As we explain in part IV of this opinion, however, we reject the defendant's claim that the impanelling of those jurors violated the defendant's right to an impartial jury.
IV
RIGHT TO IMPARTIAL JURY
The defendant next claims that the trial court's failure to excuse three jurors who were accepted by the defendant violated the defendant's right to an impartial jury under the federal and state constitutions. The defendant contends that each of the three jurors offered only equivocal assurances of impartiality and, therefore, that the trial court abused its discretion by failing to excuse them, notwithstanding defense counsel's failure to challenge the jurors for cause, failure to exhaust peremptory challenges, and affirmative acceptance of each of the three jurors.[9] We have long held that "even an improper denial of a challenge for cause provides cause for reversal only if 'the party [who makes the challenge] subsequently exhausts all of his or her peremptory challenges and an additional challenge is sought and denied.' " (Emphasis in original.) State v. Kelly , 256 Conn. 23, 31, 770 A.2d 908 (2001), quoting State v. Esposito , 223 Conn. 299, 313, 613 A.2d 242 (1992). In light of that established rule, it would defy all logic and run contrary to basic notions of fairness to conclude that the facts of the present case entitle the defendant to reversal of the judgment. That is, it is well established that the failure to exhaust peremptory challenges prevents this court from reversing a judgment on the basis of a subsequent denial of a challenge to a juror. It would therefore make no sense to reverse the judgment of conviction in the present case, where the defendant not only failed to exhaust peremptory challenges, but never challenged any of the three jurors at all, and, in fact, affirmatively accepted each juror. To the contrary, the actions of defense counsel make it virtually impossible to conclude that the trial court abused its discretion in failing to excuse the jurors, as it would reasonably have concluded that counsel viewed the jurors as acceptable. See State v. Vitale , 190 Conn. 219, 225, 460 A.2d 961 (1983) ("[u]nless all his peremptory challenges have been exercised before the completion of jury selection, it is presumed that no juror was permitted to serve whom the defendant regarded as biased or unsuitable, although he might have preferred others"). Accordingly, we reject the defendant's claim that the trial court abused its discretion in failing to excuse the jurors.
V
COMPETENCE TO STAND TRIAL
We next address the defendant's claim that the trial court improperly found him *907 to be competent to stand trial before the guilt phase.[10] The defendant advances three arguments in support of his claim. First, he claims that the trial court improperly gave more weight to the determination of the court-appointed evaluation team than it did to the two experts produced by the defendant. The defendant's second and third claims are that the trial court improperly interpreted the defendant's burden to overcome the statutory presumption of competence. See General Statutes § 54-56d. That is, his second claim is that the court interpreted that burden in a manner that violated his right to due process, requiring him to produce experts who could testify at his competency hearing with certainty that his failure to communicate with his attorneys was not volitional.[11] Third, the defendant contends that, in violation of his right to equal protection, the court interpreted § 54-56d to require a burden different from the one that would apply if the court had sua sponte raised the issue of competence.
The state responds that the trial court properly applied the governing legal standard and, therefore, that the court's determination that the defendant was competent did not constitute an abuse of discretion. We agree with the state.
A
Facts
We set forth the following additional relevant facts and procedural background. On April 7, 2004, defense counsel filed a motion for a competency examination. In the motion, counsel asserted that they had been unsuccessful in their attempts to persuade the defendant to discuss the events before, during and after the shooting. They contended that his failure to speak with them or with anyone else on the defense team regarding those events, as well as his failure to discuss his character, background and history, rendered him unable to assist in his own defense. In support of the motion, counsel also noted that, in preparation for trial, the defendant had met with Madelon Baranoski, a licensed clinical psychologist. The defendant told Baranoski that God had told him not to speak to counsel or to members of the defense team concerning the issues and events relevant to his defense. In light of that divine instruction, the defendant informed Baranoski, he would speak only to God about those issues. Defense counsel also relied on the defendant's reported academic "problems," which they suggested had led the defendant repeatedly and consistently to express the belief that, by not speaking to his attorneys, he was exercising his "right to remain silent."
The court granted the defendant's motion for a competency examination, and the clinical team from the Department of Mental Health and Addiction Services, Office of Court Evaluations (evaluation team or team), examined the defendant the next day, for approximately two hours and forty minutes. The court held the competency *908 hearing shortly thereafter, on April 16, 2004. The various experts testified that there were two alternatives for understanding the defendant's failure to communicate with his attorneys regarding the events surrounding the shooting: either he was choosing not to cooperate of his own volition, in which case he was competent; or he was prevented from being able to cooperate by some mental illness or disorder.
The court-appointed evaluation team unanimously found that, because the defendant had "the capacity to understand the proceedings against him and to assist in his defense," he was competent. At the competency hearing, the defendant presented the testimony of Betsy Graziano, a licensed clinical social worker, who was a member of the evaluation team and prepared the team's report following the evaluation. Graziano testified that the report was based on the evaluation team's interview of the defendant and its review of numerous other materials. The report identified those materials as including communications between the defendant and Baranoski, police reports, school records and evaluations, a psychological evaluation and a psychiatric consultation conducted when the defendant was a minor, and consultations with Joseph Coleman, director of mental health services at Walker Correctional Institution, where the defendant was at that time imprisoned. When questioned by the defendant, Graziano clarified that the team found that the defendant was able to assist in his defense, except for his failure to share his version of the events leading up to his arrest and his failure to provide defense counsel with information concerning his character, background and history.
As to the defendant's failure to share that information, Graziano further testified that, although the team was unable to determine with certainty that the defendant's failure to discuss this information was volitional, the members of the team suspected that he was choosing not to cooperate with his attorneys, and they had no reason to believe that his failure to cooperate was due to a mental illness or disorder. Put another way, she stated, the evaluation team "felt pretty sure that [the defendant's failure to communicate] was not based on cognitive deficit or an irrational, psychotic process ...." When pressed to explain why the team concluded that it could not determine with certainty whether the defendant was choosing not to cooperate, Graziano explained that, although the team did not believe that the defendant was attempting to deceive the team members, it was apparent that he was attempting to control the interview, thus making it more challenging to discern his true motives.
The defendant also introduced the testimony of Howard Zonana, a psychiatrist in the Department of Psychiatry at Yale Medical School, who had been retained by the defense team to perform an independent evaluation of the defendant. Zonana disagreed with the evaluation team's conclusion that mental illness or disorder could be ruled out. Although he conceded that the defendant's conduct may be volitional, he questioned the logic of the team's conclusion and ultimately concluded that the defendant was not competent. Zonana had interviewed the defendant after Graziano testified in the competency hearing. He also reviewed substantially the same additional materials as those considered by the evaluation team and had viewed a videotape of the team's interview of the defendant.
Given the defendant's reticence and his intellectual limitations, Zonana stated that it was difficult to provide a precise diagnosis after a single interview that lasted only *909 two hours. On the whole, however, he believed that the evidence supported the conclusion that the defendant may suffer from a mental disorder. Some of the particular traits that Zonana listed as supporting that conclusion were the defendant's extreme guardedness around and suspicion of others, his anxiety, and his tendency to lapse into disorganized thought when placed under pressure. Although he conceded that the defendant had a basic understanding of the proceedings, Zonana expressed the opinion that the defendant "may" have an underlying thought disorder that could interfere with his capacity to understand those proceedings. By way of illustration, Zonana cited to the defendant's apparent confusion regarding the meaning of the evaluation team's finding that he was competent. Specifically, the defendant did not appear to comprehend that the court would make its finding independently of the evaluation team and appeared to believe instead that the matter was conclusively settled by the team's determination. Once the defendant arrived at that conclusion, Zonana was unable to persuade him that he was mistaken. Zonana also cited to the defendant's very "global" understanding of his right to remain silent, believing that it encompassed a right not to speak to his attorneys.
As for the defendant's ability to assist in his defense, Zonana testified that he believed that the defendant was unable to communicate to defense counsel his state of mind at the time of the shooting. He noted that the evaluation team had been unable to resolve conclusively whether the defendant's lack of cooperation was volitional, but disagreed that it would be reasonable to conclude that the defendant was simply choosing not to communicate with counsel, which would require a conclusion that the defendant was malingering. That conclusion, Zonana explained, could not be reconciled with the defendant's refusal to cooperate fully with the medical professionals who had evaluated him and provided treatment to him over the years. As further evidence that the defendant was not malingering, Zonana observed that the defendant had made identical representations to a variety of different persons, including the defendant's mother, and also noted that the defendant appeared to take pride in having been found competent by the evaluation team. In his report, Zonana concluded that, "[g]iven [the defendant's] intellectual deficits, head injuries,[12] and lack of clarity surrounding his psychiatric diagnosis I feel that he does not have the capacity to work with his attorneys."
Finally, the defendant presented the testimony of Baranoski, who had first been retained by the defense in 2001 to perform an evaluation of the defendant. She was never asked by the defense to conduct a competency evaluation of the defendant, and she did not perform one. On the basis of her meetings with the defendant over the years, however, Baranoski concluded that the defendant's failure to cooperate was not volitional and was entirely due to a psychiatric disorder. She met with the defendant twice in 2001, for a total of four hours. Although he initially cooperated, he became angry with her when she graduated from straightforward cognitive and organic testing to more nuanced, less structured tests. When she challenged him, the defendant began to provide very scripted responses with a large amount of religious content. The harder she pushed, the more agitated, pressured and disorganized his *910 speech became. She characterized his speech at those times as so loose and disorganized that it constituted a "word salad." That is, she explained, he connected words in a manner that violated basic rules of syntax and did not make sense. After the second session, the defendant refused to see her.
Baranoski did not meet with the defendant again until March 20, 2004, at which time he agreed to see her. In her desire to avoid another termination of their meetings, Baranoski was less confrontational when she resumed sessions with the defendant. She met with him five times, for a total of approximately twelve hours. During those sessions, he did not speak to her of the incidents surrounding the shooting and told her that he would speak only to God about them. She testified that the defendant showed signs of delusional thinking, likening himself to Jesus Christ, and proclaiming: "I am the living example of all those forces combined. I am the ruler, still the ruler. Going against me, you can't go against me"; and, "I am the power in this room. I love the prosecutor. I have respect and love for everyone. Even if you smack me, if you smack me I will turn." She stated that these statements and other, similar ones evidenced a psychotic process that was triggered by circumstances that challenged his capacity to manage his anxieties. On the basis of her interviews with the defendant, she concluded that his failure to discuss the incidents surrounding the shooting was caused by a psychiatric disorder.
The state introduced evidence of telephone conversations between the defendant and his mother, offered to prove that the defendant was malingering. Specifically, through the testimony of its witness, James Pollard, at the time an employee in the security division of the Department of Correction, the state introduced recordings of two telephone conversations that the defendant had with his mother on April 7 and 8, 2004. In its brief to this court, the state emphasizes two statements that the defendant made during the April 7, 2004 conversation and suggests that those statements support the theory that the defendant was malingering. First, in response to his mother's questions regarding the ongoing competency evaluations, the defendant replied that he would not tell "them" about his case because he "ain't no fool." In the same conversation, he also indicated that he understood that, if he were found to be incompetent, the legal proceedings would "shut down."
We observe, however, that the majority of the defendant's remarks during the telephone conversations were not consistent with a theory that the defendant was malingering. For example, the defendant maintained with his mother the same position that he had stated to the evaluation team, namely, that he was declining to communicate because God had so instructed him. That is, the defendant told his mother that one of his attorneys had advised him not to remain silent during the competency evaluation. Notwithstanding that advice, the defendant informed his mother, if "the Lord" wanted him to remain silent, he would say nothing. When his mother responded by asking if his attorneys believed he was "crazy," the defendant laughed and asked her: "Did they think Jesus was crazy?"
In the April 8, 2004 telephone conversation, the defendant and his mother again discussed the evaluation proceedings. The defendant told her that he was having difficulty following the questions that the evaluation team was asking him. At one point during the conversation, when she advised him that he should just "shut down," he rejected that option, stating that he wanted to cooperate because he wanted *911 to be evaluated. His mother pointed out that, if he cooperated, it would appear that he was competent to stand trial. He answered: "So be it.... Thank God I ain't insane." He stated that, in his view, either result-being found competent or incompetent-was good. If he were found to be incompetent, it would help his case, but if he were found to be competent, that would just show that "after all these years, with no education and no books, I can go up in front of a bunch of white people, uneducated and give them a definition of who I am, and they can't even understand me because it's not meant for understanding."
The trial court issued its decision from the bench, finding that the defendant had not overcome the presumption of competence. The court summarized the following evidence that it had considered in arriving at that conclusion: the testimony of Graziano, Zonana and Baranoski, as well as their reports; the recordings of the two telephone calls that the defendant made to his mother; and the court's observations of the defendant in the courtroom. The court particularly noted its reliance on the testimony of the experts, stating that it gave less credence to Baranoski's testimony on the ground that she testified that she had not performed a formal competency evaluation of the defendant. The court instead relied on the testimony of both Graziano and Zonana. The court observed that Zonana had testified that the defendant's failure to communicate with counsel "may" be driven by a mental disorder, but that he had also conceded that the defendant's conduct may be volitional. By contrast, the court continued, Graziano had testified that the evaluation team did not believe that the defendant's failure to cooperate with defense counsel was "driven by a mental disorder" and that his behavior "may be volitional." On the basis of all of the sources it had considered, the court summarized, it concluded that the defendant had not met his burden to overcome the presumption of competence.
B
Analysis
Certain general principles guide our discussion of the defendant's three claims. "[T]he conviction of an accused person while he is legally incompetent violates due process ...." Pate v. Robinson , 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed. 2d 815 (1966). Section 54-56d (a) sets forth the required procedures and standards governing the determination of a defendant's competence and provides a definition of "not competent": "A defendant shall not be tried, convicted or sentenced while the defendant is not competent. For the purposes of this section, a defendant is not competent if the defendant is unable to understand the proceedings against him or her or to assist in his or her own defense." Pursuant to § 54-56d (b), a "defendant is presumed to be competent. The burden of proving that the defendant is not competent by a preponderance of the evidence and the burden of going forward with the evidence are on the party raising the issue. The burden of going forward with the evidence shall be on the state if the court raises the issue. The court may call its own witnesses and conduct its own inquiry." This court has stated that § 54-56d"jealously guards" the right to due process, observing that the United States Supreme Court has arrived at that conclusion regarding other states' statutes that contain protections similar to those set forth in § 54-56d. State v. Johnson , 253 Conn. 1, 20 and n.22, 751 A.2d 298 (2000).
The trial court's ultimate determination of competency is reviewed for abuse of discretion. Id., at 27 n.26, 751 A.2d 298 ; see also State v. Connor , 292 Conn. 483, 523-24, 973 A.2d 627 (2009) ("[T]he trial *912 judge is in a particularly advantageous position to observe a defendant's conduct during a trial and has a unique opportunity to assess a defendant's competency. A trial court's opinion, therefore, of the competency of a defendant is highly significant." [Internal quotation marks omitted.] ).
1
Credibility Determinations of the Trial Court
We first address the defendant's claim that the trial court improperly credited the evaluation team's finding that the defendant was competent, over the findings of Zonana and Baranoski that he was not. We observe that the defendant's characterization of the trial court's ruling is not entirely accurate. In arriving at its conclusion that the defendant was competent, the court did not assign relative weight to the ultimate conclusions arrived at by the evaluation team, Zonana and Baranoski as to whether the defendant was competent. Instead, the court concluded that the defendant had failed to overcome the presumption of competence on the ground that both Graziano and Zonana testified that they had concluded that there was some level of uncertainty as to whether the defendant's failure to communicate with counsel was due to a mental disorder. To the extent that the defendant's brief may be understood to contend that the trial court improperly credited the testimony of Graziano and Zonana, over that of Baranoski, who testified without qualification that the defendant's failure to cooperate was due to a thought disorder, we address that claim. We conclude that the trial court's decision crediting the testimony of Graziano and Zonana was not clearly erroneous.
A trial court's credibility finding will be overturned only if the finding is clearly erroneous.[13] "A factual finding is clearly erroneous when it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made.... Simply put, we give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Citation omitted; internal quotation marks omitted.) State v. Santiago , 252 Conn. 635, 640, 748 A.2d 293 (2000). The mere fact that the credibility finding pertains to the testimony of expert witnesses does not change the standard of review. See, e.g., State v. Jarzbek , 204 Conn. 683, 706, 529 A.2d 1245 (1987) ("[it] is in the sole province of the trier of fact to evaluate expert testimony, to assess its credibility, and to assign it a proper weight"), cert. denied, 484 U.S. 1061, 108 S.Ct. 1017, 98 L.Ed. 2d 982 (1988). "[W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, [however] ... our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence." (Internal quotation marks omitted.) State v. Jackson , 304 Conn. 383, 394, 40 A.3d 290 (2012).
As we already have explained, the trial court rested its decision finding the *913 defendant competent in part on the fact that both Graziano and Zonana testified that there was at least some level of uncertainty as to whether the defendant's failure to communicate with defense counsel was due to a mental disorder. Specifically, Graziano testified that, although the evaluation team concluded that the defendant's failure to communicate with counsel was not due to a mental illness or disorder and that the team suspected that he was choosing not to cooperate, the team also stated in its report that the defendant's behavior "may" be volitional. Zonana's testimony represented almost a mirror image of the opinion of the evaluation team-while the team could not exclude with certainty the possibility that the defendant was incompetent, Zonana effectively testified that he could not conclusively rule out the possibility that the defendant's failure to cooperate was due to a mental disorder. He specifically stated that he did not know whether the defendant's lack of cooperation was due to an underlying thought disorder.
By contrast, Baranoski testified that it was her opinion that the defendant felt "compelled not to talk because of [his] psychiatric disorder." She thus rejected, without qualification, the suggestion that the defendant failed to communicate with his attorneys because he chose not to do so. The trial court, however, gave less weight to Baranoski's opinion than to the opinions of Zonana and Graziano. The reason offered by the trial court withstands scrutiny-Baranoski testified that, unlike the evaluation team and Zonana, she had not been retained to perform a competency evaluation, and she did not perform one. She further testified that, when evaluating a defendant for competency, examiners follow a strict protocol that is designed to focus on the two goals of such an evaluation-to measure a defendant's capacity to have a rational understanding of the charges and the proceedings, and his ability to assist his attorneys. Her testimony, accordingly, revealed that she did not follow the same protocol as that followed by the evaluation team and Zonana. Put simply, the trial court found the opinions of the experts who had actually performed competency evaluations of the defendant to have more persuasive weight than the opinion of the expert who did not. It was not clearly erroneous for the trial court to rely on that distinction in interview protocol in finding the opinions of Zonana and Graziano to be more credible than that of Baranoski.
2
Level of Certainty Required by Trial Court
The defendant's second contention is that the trial court improperly interpreted his burden to overcome the statutory presumption of competence under § 54-56d to require him to produce experts who could testify with certainty that his failure to communicate with his attorneys was not volitional. The defendant argues that the trial court's demand for certainty is not reconcilable with the statutory language of § 54-56d (b), which requires him to demonstrate that he is not competent by a mere preponderance of the evidence. The state responds that the defendant has misconstrued the trial court's decision. Rather than requiring the defendant to produce experts who could testify with certainty that the defendant's conduct was not volitional in order to overcome the presumption of competency, the state argues that the court considered the varying degrees of certainty testified to by Graziano and Zonana, and concluded that, on balance, that testimony provided greater support for the conclusion that the defendant's conduct did not stem from a mental disorder *914 and was volitional. We agree with the state.
The trial court began by noting its observations of the defendant in the courtroom. The court then turned to the evidence it had considered in arriving at its decision: "I have heard in this case direct testimony from licensed clinical social worker ... Graziano [and] ... Zonana [and] ... Baranoski. I am familiar with all of them from years in the system. I have read the report of the team. I have read ... Zonana's report. I have heard two of the [tele]phone calls that the defendant made. I have had opportunity to observe the defendant on an almost daily basis with a couple weeks off since January 5. I have heard testimony from ... Graziano about [the other members of the evaluation team]. I have heard testimony from ... Graziano about her conversations as well as her reviewing of things with ... Coleman, [the director of mental health services] at the prison.... Zonana has also talked to [Coleman] and reported some of what's in those medical records.
"I'm particularly interested in the fact that independent examinations essentially by ... Zonana as well as-and ... Baranoski did not actually do an examination-competency examination as she just testified. But both ... Zonana in his testimony and ... Graziano in her testimony concerning the report indicate or used the word 'may.' Even ... Zonana testified, [the] defendant's failure to communicate with counsel may very well be driven-may be driven by a mental disorder. And the team doesn't think it is but says it may be volitional. And Zonana went on to testify, not know if [the] defendant's lack of ability is volitional. In sum, based on all of these sources, presumption of competency on both prongs has not been overcome, and the trial will proceed."
A careful reading of the trial court's oral decision, particularly when considered in conjunction with the testimony and reports of Graziano and Zonana, supports the state's position. With respect to the evaluation team's conclusion, for instance, the trial court emphasized that the team did not believe that the defendant's failure to communicate with counsel was the result of a mental disorder. Graziano testified that the team was "able to determine ... what was not the reason.... We felt pretty sure that it was not based on cognitive deficit or an irrational, psychotic process ...." (Emphasis added.) The team was less certain, though, as to what was the reason for the defendant's silence. When asked about that reason, the best that Graziano could say was that it "may" have been volitional. That testimony coincides with the evaluation team's report, which states that, on the basis of all of the information reviewed by the team, there was "no evidence of psychotic processes or delusional thinking, nor did the undersigned team observe any." The report concluded that "[t]he team is unable to determine the reason [the defendant] is not discussing the events that surround his arrest. However, we believe that it may be volitional, rather than driven by cognitive deficits or a psychotic process."
The trial court's characterization of Graziano's testimony and the team's report is reasonable and finds support in the record. Restated, the trial court's summary of Graziano's testimony was that the evaluation team could not state with certainty that the defendant's behavior was volitional, but the team believed that it probably was. The team could state with certainty, however, that his silence was not due to a cognitive deficit or an irrational, psychotic process. That testimony supports the trial court's conclusion that the defendant failed to overcome the presumption of competence in § 54-56d (b).
*915 The court found that Zonana's testimony and report provided further support for the conclusion that the defendant had failed to overcome the presumption of competence. Specifically, the court found it significant that Zonana testified that the defendant's failure to communicate "may" be driven by a mental disorder, and also stated that he did not know whether the defendant's behavior was volitional. Zonana's testimony, which expressed varying levels of certainty regarding the connection between the defendant's behavior and a mental disorder, provides support for the court's ruling. Although he testified that the defendant's behavior "may very well" be driven by a mental disorder, Zonana also stated that he did not know whether the defendant had an underlying thought disorder that might affect his ability to understand the proceedings. He further stated that he was unable to make a diagnosis of the defendant due to the defendant's guardedness and also because his interview with the defendant lasted only for a couple of hours. Similarly, Zonana's report conveyed differing levels of uncertainty regarding a possible link between the defendant's behavior and any mental disorder. The report stated that Zonana was unable to "make a clear diagnosis based on the interview," and referenced that "lack of clarity" in closing, but also expressed the view that it was not likely that the defendant was malingering, an opinion to which Zonana also testified.
The court's interpretation of the testimony of witnesses, including any decisions to credit part of a witness' testimony, is subject to review for clear error. Our review of the trial court's decision-particularly viewed in the context of the testimony and evidence offered during the competency hearing-persuades us that it was not clearly erroneous for the trial court to interpret the testimony of Graziano and Zonana to support the conclusion that the defendant had failed to prove by a preponderance of the evidence that he was not competent.
3
Allocation of Burden to Defendant To Prove Incompetence
Last, the defendant claims that the trial court interpreted § 54-56d to require him to bear a different burden than that which would have applied if the court had sua sponte raised the issue of competence, in violation of the defendant's right to equal protection. Specifically, the defendant's claim centers on the allocation in § 54-56d (b) of the burden to prove competence "on the party raising the issue," unless the court raises the issue of competence, in which case the state bears the burden to prove the defendant competent. See General Statutes § 54-56d (b). The defendant argues that the class of persons to which he belongs-defendants who raise the issue of their competence-is similarly situated to the class of defendants whose competence is raised by the court. The differing treatment accorded to those two classes, the defendant claims, violates his right to equal protection. Just as in cases in which the court raises the issue of a defendant's competence, the defendant argues, in the present case, in order to find him competent, the trial court was required to make an affirmative finding that he had the "present ability to consult with his lawyer with a reasonable degree of rational understanding" and a "rational as well as factual understanding of the proceedings against him." (Internal quotation marks omitted.) Dusky v. United States , 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed. 2d 824 (1960). We reject the defendant's claim.
Although the defendant does not expressly claim that § 54-56d (b) is unconstitutional in violation of his right to equal *916 protection, that is the effect of his argument. The burden allocation in the statute is clear. The trial court's interpretation of § 54-56d (b), which requires the defendant to prove that he was not competent by a preponderance of the evidence, is borne out by the plain language of the statute, which provides in relevant part: "A defendant is presumed to be competent. The burden of proving that the defendant is not competent by a preponderance of the evidence and the burden of going forward with the evidence are on the party raising the issue...." General Statutes § 54-56d (b). It is undisputed that, in the present case, the defendant raised the issue of his competence to stand trial. Accordingly, pursuant to the plain language of § 54-56d (b), the defendant bore the burden to prove by a preponderance of the evidence that he was not competent. The defendant's claim, therefore, is more properly understood to challenge the facial validity of the statute itself, rather than the trial court's interpretation of it. In other words, the defendant claims that § 54-56d (b) violates his right to equal protection by, on the one hand, requiring him to rebut the presumption of competence if he raises the claim and, on the other hand, providing that, if the court raises the issue of a defendant's competence, "[t]he burden of going forward with the evidence shall be on the state ...." General Statutes § 54-56d (b).
"To establish an equal protection violation, one must demonstrate that the challenged provision treats persons who are similarly situated differently and, in doing so, impinges on a fundamental right or affects a suspect class of individuals.... If the provision does not interfere with a fundamental right or affect a suspect class of persons, it will survive a constitutional attack as long as the distinction is rationally related to some legitimate government interest." (Citation omitted.) State v. Arias , 322 Conn. 170, 185-86, 140 A.3d 200 (2016). In his single paragraph laying out his equal protection claim, the defendant concedes that rational basis review applies to his claim. He offers no argument, however, that the statute's differing allocation of the burden, depending on whether a defendant or the court has called a defendant's competence into question, is not rationally related to a legitimate government objective. Nor does he offer any explanation as to why we should conclude that he is similarly situated to defendants whose competence is questioned sua sponte by the court. He simply makes the bare assertion that the differing treatment violates his right to equal protection. Even if we assume, without deciding, that the defendant is similarly situated to other defendants, the legislature rationally could have decided that a different allocation of the burden is appropriate when the trial court has sua sponte called into question a defendant's competence.
VI
VAGUENESS
The defendant next seeks Golding review of his unpreserved due process claim that § 53a-54b (8) is void for vagueness as applied to his conduct.[14] See *917 State v. Golding , 213 Conn. 233, 239-40, 567 A.2d 823 (1989). At the time of the shootings, § 53a-54b (8) provided in relevant part: "A person is guilty of a capital felony who is convicted of ... murder of two or more persons at the same time or in the course of a single transaction ...." The defendant contends that, although the statutory language makes clear that, in order for the state to satisfy its burden of proof under this provision, the state must do more than prove that he murdered two or more persons, the language is vague as to precisely what additionally is required. That is, the defendant claims that the phrases, "at the same time" and "in the course of a single transaction" are unconstitutionally vague. The state responds that any person of ordinary intelligence would understand that murdering two people within seconds of each other is a crime, and that doing so would make the crime fall within the meaning of the phrase "at the same time or in the course of a single transaction" in § 53a-54b (8). Therefore, the state argues, the defendant's claim fails under the third prong of Golding . We agree with the state.
The standard of review applicable to a defendant's unpreserved claim alleging constitutional error is well established. The defendant can prevail "only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation ... exists and ... deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) State v. Golding , supra, 213 Conn. at 239-40, 567 A.2d 823 ; see In re Yasiel R. , 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying third prong of Golding ). In the present case, the record is adequate for review, and the claim is of constitutional magnitude. Our inquiry, accordingly, turns to whether the defendant has demonstrated that the alleged constitutional violation existed and deprived him of a fair trial.
The following principles govern our consideration of the defendant's claim. The United States Supreme Court has stated that the vagueness doctrine prohibits "taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." Johnson v. United States , --- U.S. ----, 135 S.Ct. 2551, 2556, 192 L.Ed.2d 569 (2015). This court has explained: "A statute ... [that] forbids or requires conduct in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process.... Laws must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly." (Internal quotation marks omitted.) State v. Scruggs , 279 Conn. 698, 709, 905 A.2d 24 (2006). "[A] statute is not void for vagueness unless it clearly and unequivocally is unconstitutional, making every presumption in favor of its validity.... To demonstrate that [a statute] is unconstitutionally vague as applied to him, the [defendant] therefore must ... demonstrate beyond a reasonable doubt that [he] had inadequate notice of what was prohibited or that [he was] the victim of arbitrary and discriminatory enforcement.... If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties.... Moreover, an ambiguous statute will be *918 saved from unconstitutional vagueness if the core meaning of the terms at issue may be elucidated from other sources, including other statutes, published or unpublished court opinions in this state or from other jurisdictions, newspaper reports, television programs or other public information .... [A] term is not void for vagueness merely because it is not expressly defined in the relevant statutory scheme." (Citations omitted; internal quotation marks omitted.) State v. DeCiccio , 315 Conn. 79, 87-88, 105 A.3d 165 (2014). The principles of the vagueness doctrine "apply not only to statutes defining elements of crimes, but also to statutes fixing sentences." Johnson v. United States , supra, at 2557. Consistent with these principles, we review the language and purpose of § 53a-54b (8) to determine whether the defendant has demonstrated beyond a reasonable doubt that he had inadequate notice of the conduct that was prohibited by § 53a-54b (8).
We first consider whether the phrase "murder of two or more persons at the same time" is unconstitutionally vague as applied to the defendant. As applied to multiple murders, it is difficult to envision what other possible meaning the phrase "at the same time" could have if it were interpreted to exclude two murders that were committed within seconds of each other.[15] We have interpreted this precise language in State v. Ferguson , 260 Conn. 339, 796 A.2d 1118 (2002), to encompass murders that occur close in time to each other. In that case, in connection with the murder of five persons, the defendant was charged with two counts of capital felony in violation of General Statutes (Rev. to 1995) § 53a-54b (8). Id., at 341, 796 A.2d 1118. The defendant claimed that his protection against double jeopardy was violated by his conviction of two separate counts of capital felony because all five murders were committed in the course of a single transaction, and thus amounted to a single violation of § 53a-54b (8). Id., at 360, 362, 796 A.2d 1118. We rejected that argument, reasoning that it would require us to read out of the statute the phrase "at the same time." Id., at 361-62, 796 A.2d 1118. Applying that statutory phrase to the facts of the case, we concluded that "the evidence established that the defendant committed two separate sets of multiple murders ...." Id., at 362, 796 A.2d 1118.
The facts of each of the two sets of multiple murders in Ferguson are instructive.
*919 Three of the defendant's victims were his tenants, with whom he had been engaged in a dispute over a late rental payment. Id., at 342, 796 A.2d 1118. On the day of the murders, the defendant traveled from his home in North Carolina to the rental property in Connecticut. Id., at 343-44, 796 A.2d 1118. One of the tenants was home when the defendant arrived at the rental property, and a friend of his was in the apartment with him. Id., at 345, 796 A.2d 1118. The defendant entered the apartment and shot both of them, then placed both bodies in the bathroom. Id. He waited in the apartment for approximately two hours, until the remaining two tenants arrived home from work with a friend. Id. When the three men entered the apartment, he shot and killed each of them. Id. This court rejected the defendant's double jeopardy challenge on the ground that, "[i]f the defendant committed two independent sets of multiple murders, with the multiple murders of each set occurring 'at the same time,' he can be convicted of two counts of capital felony." Id., at 361-62, 796 A.2d 1118. On the basis of the evidence of the two sets of shootings, the court concluded exactly that, stating that "the defendant committed two separate sets of multiple murders ...." Id., at 362, 796 A.2d 1118. Each shooting, or set of murders, included victims who were murdered "at the same time." In each of these sets, the victims were shot within seconds of each other.
For purposes of interpreting the phrase "at the same time" in § 53a-54b, the two murders in the present case are indistinguishable from those in Ferguson . In both cases, the defendants shot and killed multiple victims within seconds of each other. The court in Ferguson construed those facts to establish that the murders occurred "at the same time." Accordingly, the statutory language was sufficiently clear to place the defendant on notice that his actions were prohibited by § 53a-54b (8).
The defendant also claims that the phrase "in the course of a single transaction" in § 53a-54b (8) is unconstitutionally vague as applied to his conduct. He argues that it is unclear whether that language was intended to include an instance in which a defendant kills the primary target, then murders a witness to escape detection. In State v. Gibbs , 254 Conn. 578, 602-604, 758 A.2d 327 (2000), however, this court relied on the plain language of the statute and interpreted the phrase "in the course of a single transaction" to encompass precisely this type of scenario. In Gibbs , the defendant, who was convicted of capital felony in violation of General Statutes (Rev. to 1991) § 53a-54b (8); id., at 579-580, 758 A.2d 327 ; had murdered the first victim on the night of July 11, 1992, and did not murder the second victim until the following day. Id., at 581-83, 758 A.2d 327. Due to the lapse of time between the two murders, the state did not claim that the defendant had murdered the victims "at the same time." Instead, it argued that the defendant murdered the two victims "in the course of a single transaction ...." Id., at 601, 758 A.2d 327. In rejecting the defendant's claim on appeal that the state was required to prove a temporal nexus in order to establish that he had murdered the two victims "in the course of a single transaction," this court engaged in a statutory construction analysis of that phrase. Id., at 601-604, 758 A.2d 327. To constitute a single transaction, the court reasoned, there must be some " 'clear connection' " between the murders, so that they may be viewed as part of a " 'series of related but separate events ....' " Id., at 603, 758 A.2d 327.
As for the nature of that clear connection, the court relied on *920 State v. Cobb , 251 Conn. 285, 387-89, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S.Ct. 106, 148 L.Ed. 2d 64 (2000), for the principle that what is required is a "logical nexus" between the two events. State v. Gibbs , supra, 254 Conn. at 604, 758 A.2d 327. In Cobb , the defendant had killed the victim after sexually assaulting her, in order to eliminate her as a witness. State v. Cobb , supra, at 388-99, 743 A.2d 1. In Gibbs , this court expressly cited that particular connection as one that would satisfy the "logical nexus" requirement that the court read into the statutory phrase "in the course of a single transaction." State v. Gibbs , supra, at 604, 758 A.2d 327. In summary, the court concluded, the connection between multiple murders "may be established by proof beyond a reasonable doubt that a defendant possessed a plan, motive or intent common to the murders."[16] Id., at 606, 758 A.2d 327.
An individual's decision to kill eyewitnesses to a murder is part of a larger plan to commit murder and escape the consequences. That logical nexus is sufficient to render the killing of the eyewitness or eyewitnesses a part of the same transaction as the original murder. The jury logically could have inferred that the defendant shot L and Desiree in the course of a single transaction on the basis of his having shot Desiree and Carolyn after shooting and killing L, with the intent to eliminate them as witnesses.
In summary, in light of this court's prior interpretations of the statute in Ferguson and Gibbs , the meaning of § 53a-54b (8) is not vague as applied to the defendant's conduct. To the contrary, as applied to his conduct, the statutory language is clear and unambiguous.[17]
*921 VII
SUFFICIENCY OF THE EVIDENCE
The defendant claims that the evidence was insufficient to prove beyond a reasonable doubt that he committed capital felony, murder or attempt to commit murder, and that the trial court therefore improperly denied his motion for a judgment of acquittal as to those charges.[18] We disagree.
"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt....
"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt.... If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt....
"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct.... It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence.... In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence.... The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) State v. Ledbetter , 275 Conn. 534, 542-43, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S.Ct. 1798, 164 L.Ed.2d 537 (2006).
"Ordinarily, intent can only be inferred by circumstantial evidence; it may be and usually is inferred from the defendant's conduct.... Intent to cause death may be inferred from the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death." (Internal quotation marks omitted.) State v. Diaz , 237 Conn. 518, 541, 679 A.2d 902 (1996).
"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt ... nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant *922 that, had it been found credible by the [finder of fact], would have resulted in an acquittal.... On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) State v. Ledbetter , supra, 275 Conn. at 543, 881 A.2d 290.
The defendant challenges his conviction of murder and attempt to commit murder on the ground that there was insufficient evidence to prove beyond a reasonable doubt that he had the conscious objective to cause the deaths of L, Desiree and Carolyn. He relies on the absence of any explanation for his actions and the short duration of the shooting to argue that there was insufficient evidence of intent. He further contends that the evidence equally could have supported the finding that he had acted rashly, without fully realizing or intending the fatal consequences of his conduct, or that he was simply indifferent to the result.
The evidence of the defendant's intent to kill each of the three victims was overwhelming. One fact is relevant to all three victims, and that fact alone would be sufficient to support the jury's inference that he intended to kill all three. The defendant shot each victim in the head at close range. It is permissible to infer intent to kill from the type of weapon used and the manner in which it was used. See State v. Diaz , supra, 237 Conn. at 541, 679 A.2d 902. The defendant used a gun. He fired at close range. He aimed for the head. He then fled the scene without attempting to render aid to any of them. The defendant's suggestion that there was insufficient evidence for the jury to conclude that he had more than a reckless state of mind when he shot each of the three victims runs counter to established principles governing the permissible inferences that a jury may draw regarding the intent to kill.
The state presented additional evidence as to each of the three victims that supports the jury's finding that the defendant intended to kill each of them. With respect to L, the state produced evidence that the defendant had been arrested on August 24, 2000-a mere two days prior to the shooting-and charged with breach of the peace and violation of a protective order that had previously been issued against him as to L. As a result of that incident, a second protective order was issued against the defendant as to both L and their son. Testimony regarding the August 25, 2000 protective order was introduced into evidence.[19]
The state also produced evidence that, on multiple occasions, the defendant had been seen in possession of a gun that matched the description of the gun that Carolyn saw when he shot L. For instance, both J and Minerva Texidor, the mother of Cortez, testified that they had seen the defendant with a gun that matched the description of the one that he used during the August 26, 2000 shooting. That testimony is consistent with a finding that the defendant had planned the shooting in advance.
The state also produced evidence that the defendant had used the gun two days before the shooting, when he fired shots at 131 Sargeant Street, where he knew L was staying. Specifically, early in the morning of August 24, 2000, the defendant drove to 131 Sargeant Street, where he knew L had stayed the previous night, and-with a gun that matched the description of the gun *923 used on the day of the shooting-fired three shots at a second story window in the building.
The state also established that, on the night of the shooting the defendant traveled in a taxicab to 131 Sargeant Street directly from his home in Bloomfield. The state proved that he simply pulled the gun out of his pocket to shoot L, and that he waited to do so until L was in a vulnerable position, bending down to tie her shoe. From all of this evidence, the jury reasonably could have inferred that, with the intent to kill L, he brought the loaded gun with him from his home to
Sargeant Street, had it on his person immediately prior to the shooting, and concealed it until he saw the opportunity to shoot.
As to the defendant's intent to kill Desiree and Carolyn, some of the evidence produced by the state was relevant to prove his intent to kill as to both victims, such as that the two women were in the immediate vicinity when the defendant shot L, that they began screaming and running when he discharged the weapon, and that, after he shot L, the defendant immediately chased down and shot the two women who had just witnessed the shooting.
Other evidence produced by the state was relevant to show the defendant's intent to kill Desiree. After he shot L, the defendant next shot Desiree, which caused her to fall to the ground. Although the state's expert could not testify with a reasonable forensic probability whether the first shot killed Desiree, he indicated that it was more likely that it did not. Specifically, he testified that the likely trajectory of the first gunshot was that it passed through Desiree's forearm, through a superficial portion of her breast, and then through her chin. His opinion was based in part on the fact that there was no evidence, from the exit wound of her forearm, that her arm was resting against anything when the bullet came out of it. That suggested to the state's expert that, when her forearm was struck, Desiree still had physical control of it, something that would not be possible after the gunshot to her head.
After he shot Carolyn, the defendant walked back to where Desiree was lying on the ground, and shot her again, likely in the head. Regardless of whether the first shot killed Desiree, the defendant's decision to shoot her a second time establishes that his intent was to kill her.[20] With respect to Carolyn, the state produced evidence that the defendant first shot her through her forearm, which she had raised in front of her body. He walked over and stood immediately behind her to shoot her a second time, in the back of the head. Then, as she was lying on the porch pretending to be dead, he shook her to verify that she was dead. This evidence is more than sufficient to establish his intent to kill Carolyn.
The defendant also argues that the evidence was insufficient to establish beyond *924 a reasonable doubt the elements of capital felony. He contends that, even if the evidence proved that he committed two murders, it was not sufficient to prove that he murdered two persons "at the same time or in the course of a single transaction ...." General Statutes (Rev. to 1999) § 53a-54b (8). The defendant relies on two arguments that he has advanced-and we have rejected-in support of his claim that § 53a-54b is void for vagueness.
First, the defendant reads the phrase, "at the same time," to require the state to prove that two victims were murdered in precisely the same instant, by the same gunshot. Because the defendant shot L and Desiree within seconds of each other, with distinct gunshots, rather than simultaneously with the same gunshot, he argues that there was insufficient evidence that the murders were committed "at the same time." As we explain in part VI of this opinion, we reject that interpretation of § 53a-54b (8).
Second, he argues that the evidence was insufficient to establish that the murders were committed "in the course of a single transaction." That alternative, the defendant contends, was intended by the legislature to encompass scenarios in which a defendant had formulated a plan to kill multiple victims. The defendant claims that the state's rationale, which is that it proved that he murdered Desiree because she was an eyewitness to L's murder, is not sufficient to satisfy the single transaction requirement of § 53a-54b (8). As we explain in part VI of this opinion, the defendant's argument cannot be reconciled with this court's decision in State v. Gibbs , supra, 254 Conn. at 602-604, 758 A.2d 327, which interpreted § 53a-54b (8) to encompass a scenario in which a defendant killed a second victim to escape detection. Because we have rejected the interpretations of § 53a-54b (8) on which the defendant relies to argue that the evidence was insufficient to prove beyond a reasonable doubt the elements of capital felony, the defendant cannot prevail on this claim.
VIII
ESTABLISHMENT OF AFFIRMATIVE DEFENSE OF EXTREME EMOTIONAL DISTURBANCE AS A MATTER OF LAW
The defendant also contends that no reasonable jury could have found that he failed to meet his burden to establish his affirmative defense that he acted under the influence of an extreme emotional disturbance. In order for us to agree with the defendant, we would have to conclude that he had established his defense as a matter of law. The record does not support that conclusion.
The defendant bore the burden to demonstrate by a preponderance of the evidence "that he had caused the death of the victim[s] under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse measured from the viewpoint of a reasonable person in the defendant's situation under the circumstances as the defendant believed them to be." (Internal quotation marks omitted.) State v. Crespo , 246 Conn. 665, 676-77, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S.Ct. 911, 142 L.Ed. 2d 909 (1999). As the state points out, however, the defendant did not testify or present expert testimony regarding his state of mind at the time of the shootings. Instead, the defendant relies on the following to support his claim that he established his affirmative defense as a matter of law. There was evidence that the defendant and L had a series of domestic disputes over the custody of their son. The shooting was sudden and unexplained. On cross-examination, Carolyn agreed with *925 defense counsel's description of the defendant as having a "blank" look on his face when he shot her, as if he "wasn't there." After the shooting, the defendant behaved in a bizarre manner. Cortez observed that he was sweating and not responding to her questions, and she described his eyes as wide open and staring. Bolling recalled that the defendant's hair was messy, and she described him as appearing "out of it." She also stated that, when she returned from the nightclub, the defendant appeared "weird" and "bugged out." When the defendant appeared at the hospital with his son, he repeatedly told the nurses who conversed with him that the baby was cold, even though the baby appeared to be comfortably sleeping, and the defendant appeared to be anxious and agitated.
The evidence relied on by the defendant falls far short of what would be required to allow us to conclude that no reasonable jury could conclude that he failed to establish his affirmative defense by a preponderance of the evidence. Many of the facts relied on by the defendant could support a variety of inferences, including the inference that, although he shot L because of the dispute they were having over their son, he was not under the influence of extreme emotional disturbance at the exact time of the shooting.
IX
ADMISSION OF AUTOPSY REPORTS
The defendant next argues that, because the medical examiner who created the autopsy reports did not testify at trial, the admission of those reports violated his rights under the federal and state constitutions to confront his accusers. In particular, the defendant argues that, under Crawford v. Washington , 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed. 2d 177 (2004), and its progeny, autopsy reports are testimonial in nature and therefore admissible under the confrontation clause only when "the declarant is unavailable, and ... the defendant has had a prior opportunity to cross-examine." Because we conclude that the admission of the autopsy reports was harmless, we need not resolve whether their admission into evidence implicated the confrontation clause.
The record reveals the following facts relevant to this claim. Arkady Katsnelson, an associate medical examiner for the state, completed the autopsies of L and Desiree. At the guilt phase of the trial, however, because Katsnelson had recently retired, the state called H. Wayne Carver II, the state chief medical examiner, to testify as an expert in the field of forensic pathology. Through Carver's testimony, the state admitted Katsnelson's autopsy reports without objection from the defendant. Carver concluded that both L and Desiree suffered gunshot wounds to the head. The defendant does not challenge Carver's testimony or conclusions, but solely the admission of the autopsy reports.
"It is well established that a violation of the defendant's right to confront witnesses is subject to harmless error analysis ...." (Citation omitted.) State v. Smith , 289 Conn. 598, 628, 960 A.2d 993 (2008). A defendant "can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation ... exists and ... deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these *926 conditions, the defendant's claim will fail." (Emphasis in original; footnote omitted.) State v. Golding , supra, 213 Conn. at 239-40, 567 A.2d 823 ; see In re Yasiel R. , supra, 317 Conn. at 781, 120 A.3d 1188 (modifying third prong).
The defendant's claim fails under the fourth prong of Golding . The state has demonstrated beyond a reasonable doubt that the admission of the autopsy reports-an issue subject to harmless error review-was harmless, even if erroneous. The autopsy reports were merely cumulative. The state presented overwhelming evidence that Desiree and L both died from gunshot wounds to the head. First, Anthony Morgan, the emergency room surgeon who treated Carolyn and L, testified that L had suffered a gunshot wound to the brain and died of her injuries. Second, James Garrow, one of the paramedics who responded to the scene of the shooting, testified that L had a gunshot wound to the head with visible blood and brain matter, and that Desiree appeared to have suffered gunshot wounds to the face. Third, on the basis of photographs of the victims, Carver independently concluded that both L and Desiree suffered gunshot wounds to the head. Finally, eyewitness testimony further corroborated that both victims died of gunshot wounds to the head. Carolyn testified that she saw the defendant shoot L in the head. Christopher Shand, who lived on Sargeant Street across from the scene of the shooting, looked out a window in his home after hearing gunshots. He testified that he witnessed a man shoot a woman while she was on the ground. Diana Thomas, who also lived on Sargeant Street, testified that she heard gunshots and then looked out her window to see Desiree lying on the ground with a man standing next to her. Thomas then saw the man shoot another woman, who was on the steps of 131 Sargeant Street.
In light of this overwhelming evidence, any error was harmless. The defendant's claim fails under the fourth prong of Golding .
X
FAILURE TO STRIKE AND TO INSTRUCT JURY TO DISREGARD EVIDENCE RELEVANT TO WITHDRAWN COUNT
The defendant next seeks Golding review of his evidentiary claim that the trial court improperly failed to act, sua sponte, to strike certain evidence and to instruct the jury to disregard that evidence. Specifically, the court had admitted evidence, on the ground that it was relevant to count seven of the information, that, on the day of the shooting, the defendant possessed a pistol or revolver and that he knew that he was subject to a protective order issued by a court "in a case involving the use, attempted use or threatened use of physical force against [L], in violation of [§ 53a-217c (a) (5) ]." The evidence that was admitted, over the defendant's objections, was offered by the state to prove the existence of a protective order that had been issued against the defendant on August 25, 2000. Subsequent to the admission of that evidence, the state withdrew count seven of the information. That evidence concerned a domestic dispute between the defendant and L that occurred on August 24, 2000, and his resulting arrest on charges of breach of the peace and violation of an existing protective order. See footnote 19 of this opinion. As a result of the incident, a second protective order-the one relied on by the state for purposes of count seven of the information-was issued. The trial court grounded its ruling that the evidence was *927 admissible on the relevance of that evidence to count seven of the information. The defendant contends that, because the state subsequently withdrew count seven, the court was obligated, sua sponte, to strike the evidence and to instruct the jury to disregard it. The defendant concedes that the issue is unpreserved, but argues that he is entitled to Golding review because the claim is of constitutional dimension and the trial court's failure to act sua sponte on this evidentiary matter deprived him of a fair trial. The defendant argues that the trial court has a duty to exclude irrelevant evidence, regardless of whether a party has objected to that evidence. If we accepted the defendant's argument, we would accede to the transformation of virtually every evidentiary challenge grounded on relevance into a constitutional one. That we will not do. The issue is not preserved, and we decline to address it.
XI
ADMISSION OF UNCHARGED MISCONDUCT EVIDENCE
The defendant next challenges the trial court's ruling that permitted the admission of evidence of certain uncharged misconduct, as well as the court's instruction to the jury regarding the purpose of that evidence. The defendant's claim centers on testimony that he fired three gunshots at the house at 131 Sargeant Street two days before the conduct with which he was charged in the present case. The defendant contends that the trial court improperly admitted the evidence for the purpose of establishing motive, and that it improperly instructed the jury that it could consider the evidence for the purpose of motive or identity. Assuming, without deciding, that the defendant preserved his claims, we reject them.[21]
The jury reasonably could have found the following facts relevant to our resolution of the defendant's claim. Shortly before 2 o'clock in the morning of August 24, 2000, Kanika Ramsey was a passenger in a vehicle driven by the defendant. The defendant pulled in front of 131 Sargeant Street, reached across Ramsey's body, pointed a gun out of the open passenger window and fired three shots at a second floor window-striking it-before driving away. Cleopatra Isaac, who lived in the second floor apartment of 131 Sargeant Street, heard her five year old daughter cry and say that her window was broken. When Isaac went into her daughter's room, she observed three holes in the window, a piece of metal on the floor, and a hole in a wall. Isaac immediately called the police to report the incident. Later that morning, Detective Mark R. Fowler of the Hartford police responded to the complaint and, upon viewing the three holes in the windows, concluded that they were possible bullet holes.
The state offered the following additional testimony that would have permitted the jury to find that when the defendant fired the gun out of his vehicle at 131 Sargeant Street, he was aware that L was likely in the building at that time and that the gun he used was the same one he used during the August 26, 2000 shooting. As to the defendant's awareness of L's presence in the building, Isaac testified that Desiree lived on the third floor of 131 Sargeant Street. J, L's mother, testified that L was staying with Desiree at that address on August 23 and 24, 2000, and that she believed *928 the defendant knew that fact. Regarding the gun used during both the August 24 and 26 shootings, Ramsey testified that the gun used by the defendant during the August 24 shooting was silver, had a white handle, and was "round where the bullets go." Her description of the gun was generally consistent with descriptions other witnesses gave of a gun in the defendant's possession. For example, Carolyn described the gun used during the August 26, 2000 shooting as silver. J testified that she previously had seen the defendant with a silver revolver with a pearl handle. Approximately one month before the charged shooting, Texidor saw the defendant with a silver gun with a "little wheel where the bullets go."
The following procedural facts are also relevant to our resolution of this issue. When the state called Isaac as a witness, defense counsel objected to the proposed testimony on the ground that the prior uncharged misconduct was irrelevant and prejudicial, and that the state had not established any exception to the general prohibition against the admissibility of such misconduct evidence. The state countered that Isaac's testimony was relevant to establish motive. The court ruled that Isaac's testimony would not be unduly prejudicial, but did not rule that the evidence was relevant to establish motive, merely stating that relevancy was "going to have to be established by tying it up" with further witness testimony about the incident.
In its final charge, the trial court did not instruct the jury that it could consider the evidence of the August 24 shooting as relevant to motive. Instead, the court instructed the jury that "[e]vidence concerning the shooting of the house of 131 Sargeant Street prior to the date of the events charged in this information, if you believe such evidence, can be used both concerning the defendant's knowledge or possession of the means that might have been useful or necessary for the commission of the crimes charged and as evidence of the identity of the person who committed the crimes charged."
"Our standard of review on such matters is well established. The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court.... [E]very reasonable presumption should be given in favor of the trial court's ruling.... [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done." (Internal quotation marks omitted.) State v. Colon , 272 Conn. 106, 333, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S.Ct. 102, 163 L.Ed. 2d 116 (2005).
In general, "evidence of prior misconduct is inadmissible to prove that a criminal defendant is guilty of the crime of which the defendant is accused." (Internal quotation marks omitted.) State v. Beavers , 290 Conn. 386, 399, 963 A.2d 956 (2009). Section 4-5 (a) of the 2000 edition of the Connecticut Code of Evidence prohibits the admission of "[e]vidence of other crimes, wrongs or acts of a person ... to prove the bad character or criminal tendencies of that person." Prior misconduct evidence is admissible, however, for some purposes that are distinct from the purpose of proving that a defendant has a bad character or criminal tendencies. Specifically, such evidence "is admissible ... to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony." Conn. Code Evid. (2000) § 4-5 (b).
Prior misconduct evidence is admissible if it is "relevant and material to at least one of the circumstances encompassed *929 by the exceptions" and if the probative value of the evidence outweighs any prejudicial effect. (Internal quotation marks omitted.) State v. Pena , 301 Conn. 669, 673-74, 22 A.3d 611 (2011). "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue.... One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable .... Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter.... Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Internal quotation marks omitted.) Id., at 674, 22 A.3d 611.
The trial court would have been well within its discretion to admit the prior misconduct evidence as relevant and material to prove any of the three purposes mentioned in the record: (1) motive; (2) means; or (3) identity. Motive is one of the express exceptions to the general bar against prior misconduct evidence. See Conn. Code Evid. (2000) § 4-5 (b). "Evidence of prior misconduct that tends to show that the defendant harbored hostility toward the intended victim of a violent crime is admissible to establish motive." State v. Lopez , 280 Conn. 779, 795, 911 A.2d 1099 (2007). In the present case, the misconduct evidence tended to show that the defendant harbored hostility toward the intended victim. See id. (concluding that trial court properly admitted prior misconduct evidence for purpose of establishing motive in murder case where defendant had threatened two victims with gun two to three weeks before shooting them). Indeed, Ramsey's testimony about the August 24, 2000 shooting established that just two days before shooting L, Desiree and Carolyn at 131 Sargeant Street, the defendant fired three shots at that address, knowing that L was staying there. Thus, the evidence was highly relevant to motive and admissible on that ground.[22]
The prior misconduct evidence also was relevant to establish means. Although means is not enumerated as an exception to the prior misconduct bar in § 4-5 of the 2000 edition of the Connecticut Code of Evidence, the exceptions listed therein are "intended to be illustrative rather than exhaustive." Conn. Code Evid. (2000) § 4-5 (b), commentary. A court is not precluded "from recognizing other appropriate purposes for which other crimes, wrongs or acts evidence may be admitted, provided the evidence is not introduced to prove a person's bad character or criminal tendencies ...." Conn. Code Evid. (2000) § 4-5 (b), commentary. Establishing means is one such alternative, appropriate purpose for which prior misconduct evidence may be admissible. See State v. Pena , supra, 301 Conn. at 675, 22 A.3d 611 (upholding trial court's ruling admitting prior misconduct evidence because it demonstrated that defendant possessed means to commit charged conduct).
Indeed, "[e]vidence indicating that an accused possessed an article with *930 which the particular crime charged may have been accomplished is generally relevant to show that the accused had the means to commit the crime .... The state does not have to connect a weapon directly to the defendant and the crime. It is necessary only that the weapon be suitable for the commission of the offense." (Internal quotation marks omitted.) Id. For example, in Pena , prior misconduct evidence that established that the defendant possessed "a black pistol approximately three months prior to the shooting" was relevant where "the victim [of the charged conduct] had died from a gunshot wound, and eyewitness testimony also established that the defendant had displayed a black pistol during his dispute with the victim." Id. This court observed that the prior misconduct evidence "supported the inference that the defendant had access to the type of weapon that was used to kill the victim." Id.
In the present case, the prior misconduct evidence is highly relevant means evidence. As we have explained, the state presented evidence that the description of the gun used in the August 24, 2000 shooting was consistent with the description of the gun he used during the August 26, 2000 shooting. Both Ramsey and Carolyn described the gun as silver. Ramsey's description of the gun also matched the description given by other witnesses of a gun in the defendant's possession in the months that preceded both shootings. We emphasize that in order to establish relevance, the state need not have demonstrated that the weapon used in the uncharged conduct was in fact the same as the one used in the charged conduct. It is sufficient that the state established that the gun the defendant possessed could have been used as a means to accomplish the charged offense. See id. Given the close proximity in time between the prior misconduct and the charged conduct, and in light of the supporting testimony of other witnesses about the defendant's gun, that threshold is met in the present case. Ramsey's testimony was relevant to establish means, and, therefore, the trial court did not abuse its discretion by charging the jury that it could consider the prior misconduct evidence for that purpose.
The trial court also properly instructed the jury that it could consider the prior misconduct evidence to establish identity.[23] Identity is one of the exceptions recognized in § 4-5 (b) of the 2000 edition *931 of the Connecticut Code of Evidence to the general bar against prior misconduct evidence. "Evidence of other crimes or misconduct of an accused is admissible on the issue of identity where the methods used are sufficiently unique to warrant a reasonable inference that the person who performed one misdeed also did the other. Much more is required than the fact that the offenses fall into the same class. The device used must be so unusual and distinctive as to be like a signature." (Internal quotation marks omitted.) State v. Ibraimov , 187 Conn. 348, 354, 446 A.2d 382 (1982).
The state always has the burden to prove identity as an element of the offense, and the prior misconduct testimony was relevant to that purpose. Ramsey's testimony tends to show that the defendant possessed a silver gun shortly before the charged conduct. Carolyn testified that the defendant used a silver gun. A silver gun is important identity evidence that is highly relevant. Many courts would consider the defendant's silver gun a signature device. See State v. Collins , 299 Conn. 567, 584 n.17, 10 A.3d 1005 (citing cases that "have concluded that, in the context of uncharged misconduct, a defendant's use of the same gun to commit the charged offense constitutes a 'signature' for purposes of the identity exception"), cert. denied, 565 U.S. 908, 132 S.Ct. 314, 181 L.Ed. 2d 193 (2011). Although this court has not expressly adopted that position, we review the trial court's ruling under the deferential, abuse of discretion standard. Giving every "reasonable presumption ... in favor of the trial court's ruling" we cannot conclude that "an injustice appears to have been done." (Internal quotation marks omitted.) State v. Colon , supra, 272 Conn. at 333, 864 A.2d 666.
For prior misconduct evidence to be admissible, it must not only be relevant and material, but also more probative than prejudicial. State v. Pena , supra, 301 Conn. at 673-74, 22 A.3d 611. "[T]he trial court's discretionary determination that the probative value of evidence is not outweighed by its prejudicial effect will not be disturbed on appeal unless a clear abuse of discretion is shown.... [E]very reasonable presumption should be given in favor of the trial court's ruling." (Internal quotation marks omitted.) Id., at 676, 22 A.3d 611. Our review persuades us that the trial court properly determined that the balancing test favored admitting the evidence.[24] The prejudicial impact of uncharged misconduct evidence is assessed in light of its relative "viciousness" in comparison with the charged conduct. See State v. Collins , supra, 299 Conn. at 588, 10 A.3d 1005 ("uncharged misconduct evidence has been held not unduly prejudicial when the evidentiary substantiation of the vicious conduct, with which the defendant was charged, far outweighed, in severity, the character of his prior misconduct" [internal quotation marks omitted] ). It is beyond debate that, by comparison, shooting at the home where the defendant believed L to be staying is less vicious than shooting the three victims in the head at close range. By contrast, the probative value of the evidence, particularly as to the defendant's intent to kill L, was high. Accordingly, the trial court acted within its discretion in admitting the prior misconduct evidence.
XII
ADMISSION OF EYEWITNESS IDENTIFICATIONS
The defendant claims that the trial court improperly denied his motion to suppress *932 the eyewitness identifications made by Richard Davieau. The defendant claims that those identifications were unreliable and the product of unnecessarily suggestive identification procedures, in violation of the defendant's right to due process. Because we conclude that any error was harmless beyond a reasonable doubt, we need not resolve whether the identifications were unreliable and the product of unnecessarily suggestive identification procedures.
In reviewing the trial court's denial of the defendant's motion to suppress Davieau's identifications, "[w]e review the record in its entirety and are not limited to the evidence before the trial court at the time of the ruling ...." (Internal quotation marks omitted.) State v. Edwards , 299 Conn. 419, 439 n.16, 11 A.3d 116 (2011). Our review of the record reveals the following additional relevant facts. In August, 2000, Davieau worked as a taxicab driver for Diamond Cab, which had its offices in Bloomfield. On August 26, 2000, at 8:48 p.m., Davieau picked up a fare at 27 Ledyard Avenue in Bloomfield-an African-American male in his late teens or early twenties. After the young man got into the backseat, but before Davieau drove away, a woman came to the front door of the house and told the young man that he had a telephone call. The young man addressed the woman as "Mom" and told her to tell the caller that he was in the bathroom. Because the lighting was dark and Davieau only glanced quickly over his shoulder at the young man to ask where he was going, Davieau did not get a "good look" at him. Davieau dropped the young man off at 131 Sargeant Street in Hartford at 8:59 p.m.
A "few hours" later, Davieau received a call from dispatch at Diamond Cab directing him to report to the Bloomfield office. When he arrived there, he was met by Detective Jack Leitao of the Hartford police. Leitao asked Davieau some questions about the fare he had dropped off at 131 Sargeant Street, then asked Davieau to meet him at the Hartford police station. At the police station, Leitao showed Davieau a photographic array with eight numbered photographs. Leitao asked Davieau if anyone in the array was the person he had picked up at Ledyard Avenue that night. He instructed Davieau to take his time and to try to "narrow down and identify the person ... he picked up on that date." Leitao further testified that, although they did not provide witnesses with a written advisement, as a practice, the Hartford police always informed an eyewitness that the suspect may or may not be in the photographic array. Because he was not "100 percent" certain, the best that Davieau was able to do was narrow the photographs down to two that he believed most resembled the person who was in the back of his cab that night-photographs number six and seven in the array. Photograph number six was a photograph of the defendant.
Leitao asked Davieau to return to the police station that evening to view a second photographic array. The second array included a more recent photograph of the defendant, who was the only person whose photographs were included in both photographic arrays. Davieau was able to narrow down the photographs to two that he believed most closely resembled his fare that night, photographs number four and seven. Photograph number four in the second array was a photograph of the defendant.
The defendant moved to suppress both of the identifications made by Davieau on the ground that the procedures employed by the Hartford police were unnecessarily suggestive and that the resulting identifications were unreliable in violation of his *933 right to due process. At the suppression hearing, the defendant contended that the procedure employed by Leitao, using a simultaneous photographic array rather than showing the defendant the photographs sequentially, was impermissibly suggestive. Ruling from the bench during trial, the court denied the motion to suppress on the ground that the procedures followed by Leitao comported with federal and state constitutional requirements. In a memorandum of decision filed on December 2, 2004, the court relied on then existing precedent to conclude that the procedures employed were not unnecessarily suggestive, and also concluded that, under the totality of the circumstances, the identifications were reliable.
Although many aspects of the procedures employed by the Hartford police in conducting the eyewitness identification in the present case subsequently have been called into question, and even subsequently repudiated; see, e.g., General Statutes § 54-1p (c) (1) and (2) (requiring police to present photographs in " '[p]hoto lineup' " sequentially and requiring that procedure be double-blind); State v. Ledbetter , 185 Conn. 607, 613, 441 A.2d 595 (1981) (observing that inclusion of only defendant's photograph in both arrays was suggestive because "by emphasizing the defendant it increases the risk of misidentification"); we need not resolve whether the identification procedures employed were unnecessarily suggestive or unreliable under the totality of the circumstances. Even if we assume, without deciding, that they were, any error was harmless beyond a reasonable doubt. See State v. Artis , 314 Conn. 131, 135, 101 A.3d 915 (2014) (overruling State v. Gordon , 185 Conn. 402, 441 A.2d 119 [1981], cert. denied, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 [1982], and holding that "improper admission of [eyewitness identification] evidence is subject to harmless error analysis").
In comparison to the other evidence offered by the state in the present case, Davieau's identifications of the defendant were of little consequence. We first observe that, even if the state had been precluded from offering Davieau's eyewitness identification testimony, he still would have been permitted to testify that, on August 26, 2000, at 8:48 p.m., he picked up a young, African-American male at 27 Ledyard Avenue-the defendant's home address. Davieau also would have been permitted to testify that the young man addressed the woman who came to the front door of the home at Ledyard Avenue as "mom." Finally, he would have been permitted to testify that he dropped the young man off at 131 Sargeant Street in Hartford eleven minutes later, at 8:59 p.m.
The fact that Davieau subsequently "identified" the defendant in two photographic arrays adds little to the import of his testimony. More important, even without Davieau's testimony regarding the taxi ride that the defendant took to 131 Sargeant Street on the night of the shooting, the state's evidence against him was overwhelming. Most notable, Carolyn identified him as the shooter as soon as she was physically able, when she was being driven to the hospital in an ambulance. Carolyn's identification of the defendant was particularly compelling because she knew him. Other witnesses, including Shand and Thomas, largely corroborated Carolyn's testimony regarding the details of the shooting. In the months preceding the shooting, numerous witnesses had seen the defendant in possession of a gun similar to the one used in the shooting. He had a history of domestic violence against L and a protective order as to L had been issued against him one day prior to the shooting. On the day before the protective order was issued, the defendant had fired *934 a weapon at 131 Sargeant Street, knowing that L was staying there. After he shot the victims, he burned his clothing at the home of Cortez. He later told Bolling that he had shot someone, had gone to the hospital to see if the person he had shot was dead, and asked Bolling what she would do if her son's father had shot her and two of her friends. Finally, the defendant fled to Kalamazoo, Michigan. In light of this evidence, even if the eyewitness identification testimony of Davieau was admitted improperly, any error was harmless beyond a reasonable doubt.
XIII
TRIAL COURT'S EXTREME EMOTIONAL DISTURBANCE INSTRUCTION
The defendant next claims that the trial court's instruction on his affirmative defense of extreme emotional disturbance was improper, in that the court failed to instruct the jury pursuant to his revised supplemental request to charge that "the emotional disturbance need not necessarily have been a spontaneous or sudden occurrence, and indeed, may have 'simmered' in the defendant's mind for a long period of time ...." The state responds that, because the court's instruction did not suggest that the emotional disturbance must arise from a sudden occurrence, it was not reasonably probable, or even reasonably possible, that the jury was misled by the omission of the requested language. The state also argues that, because the defendant failed to prove the affirmative defense, any error was harmless.[25] Because we conclude that there was not sufficient evidence to allow a rational juror to find that, at the time of the shooting, the defendant was under the influence of an extreme emotional disturbance that had simmered over time, we conclude that any error was harmless.
"The standard of review for claims of instructional impropriety is well established. [I]ndividual jury instructions should not be judged in artificial isolation ... but must be viewed in the context of the overall charge.... The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law.... Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict ... and not critically dissected in a microscopic search for possible error.... Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury.... In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury.... A challenge to the validity of jury instructions presents a question of law over which [we have] plenary review." (Citation omitted; internal quotation marks omitted.) State v. Santiago , 305 Conn. 101, 190-91, 49 A.3d 566 (2012), superseded in part on other *935 grounds, 318 Conn. 1, 122 A.3d 1 (2015). When a challenge to criminal jury instructions is not of constitutional dimension, an erroneous instruction is "reversible error when it is shown that it is ... reasonably probable ... that the [jurors] were misled." (Internal quotation marks omitted.) State v. Aviles , 277 Conn. 281, 310, 891 A.2d 935, cert. denied, 549 U.S. 840, 127 S.Ct. 108, 166 L.Ed. 2d 69 (2006).
The defendant concedes that this court has applied the "reasonably probable" standard to review challenges to jury instructions on the affirmative defense of extreme emotional disturbance on the ground that such claims are not of constitutional magnitude. See id. The defendant nonetheless claims that, because this is a capital case, the eighth amendment to the United States constitution dictates that any error that deprives the jury of the option of finding the defendant guilty of a lesser offense is constitutional in dimension. See Herrera v. Collins , 506 U.S. 390, 399, 113 S.Ct. 853, 122 L.Ed. 2d 203 (1993). Accordingly, the defendant contends that the "reasonably possible" constitutional standard applies to his claim, rather than the "reasonably probable" nonconstitutional standard. Because we conclude that the defendant cannot prevail under either standard, it is not necessary for us to resolve which one applies.
The rules governing a request to charge are well established. "A request to charge which is relevant to the issues of the case and which is an accurate statement of the law must be given. A refusal to charge in the exact words of a request will not constitute error if the requested charge is given in substance."
State v. Casey , 201 Conn. 174, 178, 513 A.2d 1183 (1986). This court has stated that "a defendant is entitled to a requested instruction on the affirmative defense of extreme emotional disturbance only if there is sufficient evidence for a rational juror to find that all the elements of the defense are established by a preponderance of the evidence." State v. Person , 236 Conn. 342, 353, 673 A.2d 463 (1996).
The trial court's instructions set forth in substance the basic elements of the affirmative defense of extreme emotional disturbance, but failed to include language in the defendant's revised supplemental request to charge that "the emotional disturbance need not necessarily have been a spontaneous or sudden occurrence, and indeed, may have 'simmered' in the defendant's mind for a long period of time ...."[26] Section 53a-54a (a) sets forth *936 the defense and provides in relevant part that,
"in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime." We have explained that, pursuant to § 53a-54a (a), there are two elements of the affirmative defense. The defendant must prove that "(1) [he] committed the offense under the influence of extreme emotional disturbance; and (2) there was a reasonable explanation or excuse for [his] extreme emotional disturbance." State v. Forrest , 216 Conn. 139, 148, 578 A.2d 1066 (1990).
The language requested by the defendant is a correct statement of the law. In State v. Elliott , 177 Conn. 1, 7, 411 A.2d 3 (1979), this court observed that the affirmative defense of extreme emotional disturbance, as set forth in § 53a-54a (a), "is a considerably expanded version of the common-law defense of heat of passion or sudden provocation." We explained: "It is evident from a reading of § 53a-54a (a) that the defense does not require a provoking or triggering event; or that the homicidal act occur immediately after the cause or causes of the defendant's extreme emotional disturbance; or that the defendant have lost all ability to reason....
"Before the enactment of the present Penal Code in this state, to establish the 'heat of passion' defense a defendant had to prove that the 'hot blood' had not had time to 'cool off' at the time of the killing.... A homicide influenced by an extreme emotional disturbance, in contrast, is not one which is necessarily committed *937 in the 'hot blood' stage, but rather one that was brought about by a significant mental trauma that caused the defendant to brood for a long period of time and then react violently, seemingly without provocation." (Citation omitted; footnote omitted.) Id., at 7-8, 411 A.2d 3.
The "simmering" language that the trial court omitted in the present case is related to both elements of the affirmative defense. With respect to the first element, the language makes it clear to the jury that, although the defendant must prove that he was under an extreme emotional disturbance at the time of the homicide, he is not limited to proving that the disturbance came on suddenly-he may instead prove that the disturbance was one that "simmered" in his mind over an extended period of time. The fact that the extreme emotional disturbance was one that "simmered" in the defendant's mind for a long period of time, in turn, provides guidance to the jury with respect to the second element because it clarifies that the "reasonable explanation" for the extreme emotional disturbance need not be an event or trauma that immediately preceded the homicide. Indeed, consistent with the principles we discussed in State v. Elliott , supra, 177 Conn. at 1, 411 A.2d 3, the standard Connecticut criminal jury instructions include the following language in the instruction for the affirmative defense of extreme emotional disturbance, which is virtually identical to the language requested by the defendant in his revised supplemental request to charge: "While the emotional disturbance need not necessarily have been a spontaneous or sudden occurrence, and indeed, may have 'simmered' in the defendant's mind for a long period of time, the disturbance must actually have influenced (his/her) conduct at the time of the killing." (Footnotes omitted.) Connecticut Criminal Jury Instructions 5.2-1, available at http://jud.ct.gov/JI/Criminal/Criminal.pdf (last visited January 12, 2018).
Because the requested instruction was an accurate statement of the law, the trial court should have given it.[27] See *938 State v. Aviles , supra, 277 Conn. at 315, 891 A.2d 935
(defendant's requested instruction that extreme emotional disturbance could develop over time is accurate statement of law and properly should have been given upon request). Despite this conclusion, we need not resolve whether it was reasonably possible that the jury was misled into believing that the defendant could not satisfy his burden by proving that his extreme emotional disturbance was one that had simmered in his mind over a long period of time prior to the shooting. Because there was not sufficient evidence presented at trial to allow a rational juror to find that the defendant had proven that any extreme emotional disturbance he suffered was one that had simmered over a period of time, any error was harmless.
The defendant claims that the following evidence established that, at the time of the shooting, he was under the influence of an extreme emotional disturbance that had simmered in his mind over a long period of time.[28] He and L had a relationship characterized by a history of domestic disputes over the custody of their son, as evidenced by a protective order that had been issued against the defendant as to L and their son on August 25, 2000. The protective order was issued as a result of his arrest in connection with a domestic dispute involving L and their son. Also, two days prior to the shooting, he drove by 131 Sargeant Street and shot at the house with his gun.
Carolyn agreed with defense counsel's description of the defendant during the August 26, 2000 shooting as having had a "blank" look on his face, as though he "wasn't there," when the defendant shot her the second time. After the shooting, when he was burning his clothing in Cortez' backyard, Cortez was prompted by his bizarre appearance and behavior to ask him if he had been "smoking dust." He appeared "anxious" and "guarded" when at the hospital. Later, when he was at Bolling's home, she found him in her bed, under the covers and crying, when she returned home after going out for a short period of time. She described his appearance as "weird" and "bugged out."
In closing argument, defense counsel also relied on the various missteps the defendant committed on the night of the shooting to argue that he was under the influence of extreme emotional disturbance at the time. For example, defense counsel highlighted the following evidence. The defendant took a taxicab to 131 Sargeant Street that night and did not try to conceal his identity. He committed the murders in an open area and then did not run, but walked away from the scene. He burned his clothing in a highly visible area in Cortez' backyard, and took off most of his clothes, even though he did not know whether Cortez was home to provide him with replacement clothing afterward.
We emphasize that, in our review of the evidence, we need not resolve whether it would have been sufficient to support a jury finding that the defendant was under the influence of an extreme emotional disturbance at the time of the shooting. Because the defendant's specific claim of error centers on the failure to include the "simmering" language in the extreme emotional disturbance instruction, our question is much more narrow-was there *939 sufficient evidence in the record to allow a rational juror to find that the defendant was under the influence of an extreme emotional disturbance that had simmered in his mind over a period of time prior to the shooting? In other words, was there sufficient evidence of "simmering"?
The vast majority of the evidence relied on by the defendant goes to the first element of the affirmative defense, which is whether he was under the influence of an extreme emotional disturbance at the time of the shooting. In State v. Elliott , supra, 177 Conn. at 9-10, 411 A.2d 3, we set forth three criteria intended to guide fact finders in determining whether a defendant has established the first element of the defense, explaining that "the jury must find that (a) the emotional disturbance is not a mental disease or defect that rises to the level of insanity as defined by the Penal Code; (b) the defendant was exposed to an extremely unusual and overwhelming state, that is, not mere annoyance or unhappiness; and (c) the defendant had an extreme emotional reaction to it, as a result of which there was a loss of self-control, and reason was overborne by extreme intense feelings, such as passion, anger, distress, grief, excessive agitation or other similar emotions. Consideration is given to whether the intensity of these feelings was such that his usual intellectual controls failed and the normal rational thinking for that individual no longer prevailed at the time of the act. In its charge, the trial court should explain that the term 'extreme' refers to the greatest degree of intensity away from the norm for that individual."
In State v. Forrest , supra, 216 Conn. at 148, 578 A.2d 1066, this court clarified that "[w]hen we adopted the three criteria set forth in Elliott , we did not rewrite § 53a-54a, nor did we substitute our own 'elements' for those specified by the legislature. We merely interpreted the meaning of the phrase 'extreme emotional disturbance,' and as we explained in Elliott , enumerated 'understandable guidelines' for 'instructing a jury' in determining the presence or absence of that mental condition.... These guidelines also serve to focus the presentation of evidence on three factual bases that we have deemed essential to support the inference that a defendant suffered from extreme emotional disturbance at a particular time. They are neither conclusive nor exclusive, however, for '[i]n the final analysis ... the ultimate determination of the presence or absence of extreme emotional disturbance [is] one of fact for the trier, aided by expert testimony of both sides, but left to its own factual determinations.' " (Citation omitted.)
The majority of the evidence on which the defendant relies pertains either to his appearance on the night of the shooting or his behavior during and after the shooting. For example, all of the following-Carolyn's impression that he had a blank expression on his face when he shot her, testimony that he appeared "anxious" when he was standing outside the emergency room of the hospital, Bolling's testimony that he appeared "weird" and "bugged out," and Cortez' suspicion that the defendant was under the influence of drugs-pertain to his appearance on the night of the shooting. As to his behavior during and after the shooting, the defendant points to the following-taking a taxicab to the murder scene and failing to conceal his identity; shooting the victims in the front yard of the home and walking unhurriedly away; stripping down to his underwear and burning his clothing in an open area where he could be seen; crying under Bolling's bedcovers. All of this evidence is relevant to the first element of the affirmative defense of extreme emotional disturbance because it provided at *940 least some support toward jury findings that: "(a) the emotional disturbance is not a mental disease or defect that rises to the level of insanity as defined by the Penal Code; (b) the defendant was exposed to an extremely unusual and overwhelming state, that is, not mere annoyance or unhappiness; and (c) the defendant had an extreme emotional reaction to it, as a result of which there was a loss of self-control, and reason was overborne by extreme intense feelings, such as passion, anger, distress, grief, excessive agitation or other similar emotions." State v. Elliott , supra, 177 Conn. at 9, 411 A.2d 3.
None of that evidence, however, demonstrated that the defendant was under the influence of an extreme emotional disturbance that had simmered in his mind for a long period of time. As to that particular question, in fact, the defendant relies on evidence that is at best slim. He presented no testimony, expert or otherwise, regarding his mental state at the time of or before the shooting. More important, for purposes of our resolution of his claim on appeal, there is virtually no evidence in the record that his mental state was one that had been simmering over a period of time before the shooting. This dearth of testimony regarding the defendant's mental state stands in stark contrast to the evidence typically presented in support of an affirmative defense of extreme emotional disturbance. See State v. Crespo , supra, 246 Conn. at 678, 718 A.2d 925 (testimony of forensic psychiatrist and clinical psychologist that defendant was subject to long-term and immediate stress factors at time of murder); State v. Person , supra, 236 Conn. at 346-47, 673 A.2d 463 (defendant testified as to state of mind at time of murder); State v. Patterson , 229 Conn. 328, 334-35, 641 A.2d 123 (1994) (testimony of three psychiatrists, clinical psychologist and family members describing defendant's deterioration in two years prior to murder); State v. Blades , 225 Conn. 609, 625, 626 A.2d 273 (1993) (testimony of family members, work supervisor, primary care physician and psychiatrist regarding defendant's history of substance abuse and response to stressors); State v. Casey , supra, 201 Conn. at 177-78, 513 A.2d 1183 (evidence that dispute that precipitated defendant's murder of victim was one that had been ongoing for years, testimony of clinical psychologist that defendant's behavior was consistent with that of someone in " 'transient, disassociative state,' " and testimony of defendant regarding memory lapses); State v. Elliott , supra, 177 Conn. at 3, 411 A.2d 3 (psychiatrist testified to defendant's overwhelming fear of victim and other long-term stressors). The defendant thus relied on circumstantial evidence to carry his burden of proof.
Of course, the mere fact that a defendant relies solely on circumstantial evidence does not mean he will be unable to produce sufficient evidence to allow a rational juror to find that he proved his affirmative defense. See, e.g., State v. Asherman , 193 Conn. 695, 728, 732-33, 478 A.2d 227 (1984) (holding that extreme emotional disturbance instruction was warranted on basis of testimony of witnesses regarding defendant's bizarre behavior and appearance after murder, as well as brutal nature of murder itself, which "appeared to have been perpetrated by someone who was mentally or emotionally agitated probably while under the influence of mind altering drugs"), cert. denied, 470 U.S. 1050, 105 S.Ct. 1749, 84 L.Ed. 2d 814 (1985). In the present case, however, the evidence in the record would not have been sufficient to allow a rational juror to find that the defendant had suffered from a mental trauma that simmered in his mind over a long period of time.
*941 In support of that claim, the defendant merely relies on vague references in the record that suggested that he and L were in a relationship characterized by domestic violence, taken together with the fact that, two days prior to the shooting, he shot at 131 Sargeant Street and was arrested for violating a protective order. As to the possible "reasonable explanation" for the defendant's extreme emotional disturbance, defense counsel merely stated in his closing argument that "[p]erhaps" it was "being told he could not see his son. Perhaps being arrested [two] day[s] before." As the state pointed out in its closing argument, however, the defendant failed to produce or point to any evidence that he wanted to have contact with his son and had made efforts toward achieving that goal.
To conclude from this evidence that the defendant established that he had experienced a mental trauma that simmered in his mind over a period of time would have required the jury to engage in sheer speculation. We also are mindful of the problematic policy concerns implicated by the defendant's sole reliance on his history of violence against L to prove his affirmative defense of extreme emotional disturbance. That is, the defendant claims that he has established that his alleged extreme emotional disturbance simmered because the courts previously had found sufficient basis for the issuance of a protective order against him as to L and because he had shot at the house where he knew she was staying. It would be troubling indeed if a defendant were entitled to rely on his history of domestic violence against one of his victims as the sole basis to prove his affirmative defense that, at the time of the homicides, he was under the influence of an extreme emotional disturbance that had simmered over a period of time.
For the foregoing reasons, we reject the defendant's claim that he was prejudiced by the trial court's failure to include the "simmering" language in the court's instructions on the affirmative defense of extreme emotional disturbance.[29]
XIV
PROSECUTORIAL IMPROPRIETIES
The defendant next claims that numerous statements made by the prosecutor during closing and rebuttal arguments were improper and violated his due process right to a fair trial.[30] In addition, the defendant claims that one set of remarks by the prosecutor during closing argument improperly commented on his failure to testify. We address each alleged impropriety in turn. We conclude that only one of the prosecutor's remarks was improper and that the impropriety was harmless beyond a reasonable doubt.
*942 We initially observe that the defendant acknowledges that he objected to some, but not all, of the alleged improprieties. We nonetheless review all of the defendant's claims because, under settled law, "a defendant who fails to preserve claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of State v. Golding , [supra, 213 Conn. at 239-40, 567 A.2d 823 ], and, [therefore], it is unnecessary for a reviewing court to apply the four-pronged Golding test." (Internal quotation marks omitted.) State v. Payne , 303 Conn. 538, 560, 34 A.3d 370 (2012).
The principles governing our review of the defendant's claims are well established. "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process.... The two steps are separate and distinct.... We first examine whether prosecutorial impropriety occurred.... Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial.... In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry." (Citations omitted.) State v. Fauci , 282 Conn. 23, 32, 917 A.2d 978 (2007).
"[O]ur determination of whether any improper conduct by the state's attorney violated the defendant's fair trial rights is predicated on the factors set forth in State v. Williams , [204 Conn. 523, 540, 529 A.2d 653 (1987) ], with due consideration of whether that [impropriety] was objected to at trial." (Internal quotation marks omitted.) State v. Warholic , 278 Conn. 354, 362, 897 A.2d 569 (2006). Those factors include "the extent to which the [impropriety] was invited by defense conduct or argument ... the severity of the [impropriety] ... the frequency of the [impropriety] ... the centrality of the [impropriety] to the critical issues in the case ... the strength of the curative measures adopted ... and the strength of the state's case." (Citations omitted.) State v. Williams , supra, at 540, 529 A.2d 653. If, however, the defendant's claim is that the prosecutorial impropriety "infringed a specifically enumerated constitutional right, such as the fifth amendment right to remain silent or the sixth amendment right to confront one's accusers," the burden is not on the defendant to prove prejudice. State v. Payne , supra, 303 Conn. at 563, 34 A.3d 370. Instead, if "the defendant meets his burden of establishing the constitutional violation, the burden is then on the state to prove that the impropriety was harmless beyond a reasonable doubt." Id.
"[T]he touchstone of due process analysis in cases of alleged prosecutorial [impropriety] is the fairness of the trial, and not the culpability of the prosecutor.... The issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process.... In determining whether the defendant was denied a fair trial [by virtue of prosecutorial impropriety] we must view the prosecutor's comments in the context of the entire trial." (Internal quotation marks omitted.) State v. Stevenson , 269 Conn. 563, 571, 849 A.2d 626 (2004). Mindful of these governing principles, we now turn to the defendant's claims.
A
Remarks on Intent
The defendant first claims that the prosecutor misstated the law concerning intent, distorting the state's burden of proof. Specifically, the defendant claims *943 that the prosecutor improperly argued that the defendant's use of a gun was conclusive proof of his intent and used examples to describe to the jury the process of inferring the defendant's intent from his conduct. The state responds that the prosecutor's remarks merely urged the jury to infer the defendant's intent from all of the applicable circumstances, including the fact that the defendant used a gun. We agree with the state that the remarks were not improper.
The defendant focuses on the following language in the prosecutor's closing argument: "Intent to kill, ladies and gentlemen, when you're that close, you can't have any other intent. Your intent is to kill. And when you aim for a vital part of the body, your intent is to kill."
The challenged statements must be considered in context. We set forth the entirety of the prosecutor's remarks regarding intent: "The judge is going to charge you on intent. A person acts intentionally with respect to a result when his conscious objective is to cause such result. Unless someone states his intention, you infer his intention from his conduct. That is the way we do things in life. If I walk over-which one's mine, this one? If I walk over and pick up this glass and take a drink of water, you can all infer that my intention was to take a drink of water. I could have said, I'm going to drink water now, and taken a drink, but you infer it from my conduct. That is the way we do things in life. None of us can see inside someone's brain. That is the way you infer someone's conduct. And that is the jury's job. You are supposed to make reasonable inferences and infer what his conduct was at the time of the crimes.
"I submit to you that there are many facts here from which you can infer his intent to kill these women: Number one, he brought [a] gun with him to 131 Sargeant Street; number two, he hid that gun in his clothing; number three, he waited until the first victim [L] was within an especially vulnerable position before he used that gun, bending down to tie her shoe with the side of her head perfectly in line for him to pull the gun out of his pocket and shoot her; number [four], he then approached [Carolyn], firing-again, she puts up her hand. Where does that tell you the bullet is headed? She thinks that bullet is headed toward her head. She falls down. He then either shoots Desiree or shoots Carolyn again when she's on her hands and knees, and walks up to her, stands over her, makes eye contact with her, and shoots her in the back of the head.
"Intent to kill, ladies and gentlemen, when you're that close, you can't have any other intent. Your intent is to kill. And when you aim for a vital part of the body, your intent is to kill. You can also infer his intent to kill from the fact that he fled the scene without rendering aid to his victims. Now, I know that sounds silly, but if this was an accidental shooting or a reckless shooting, you would expect the person to stop and render aid: Oh, my God, I can't believe I just shot you. I'm so sorry. Let me call an ambulance. No, that wasn't the case here. Three separate targets, three separate human targets. Two of whom were shot twice, and because this was a revolver, required five separate trigger pulls. One, two, three, four, five. Five separate acts by the defendant were required to cause these injuries. And he didn't stand-he was standing still when he shot [L]. He had to move toward his other two targets to shoot them. No accident. No reckless conduct. Intentional, purposeful, planned conduct." (Emphasis added.)
The defendant's focus on the emphasized language misrepresents the prosecutor's *944 argument. Rather than relying solely on the defendant's use of a gun to argue that the jury could infer that his intent was to kill, the prosecutor outlined multiple facts from which the jury could draw that inference: he brought the gun with him; he hid the gun in his clothing; he waited until L was in a vulnerable position before pulling the gun out of his pocket and shooting; he aimed for the head; he shot two of the victims twice; and he fled the scene without rendering aid. The prosecutor's argument merely summarized the evidence that supported the state's case-that the defendant intended to kill all three victims. By focusing only on the highlighted language, the defendant ignores the remaining remarks, which clarify that the prosecutor was merely summarizing all of the pieces of evidence from which the jury could infer intent, including evidence that he fired a gun at each of the victims from close range. Viewed in context, the remarks were not improper.
The defendant also claims that in the prosecutor's remarks on intent, she used an example that improperly diverted the jury from the real issue, whether the defendant intended to kill the victims, and suggested that the jury could find the intent element satisfied if it found that the defendant intended to shoot the victims. The defendant cites to the following remarks: "If I walk over and pick up this glass and take a drink of water, you can all infer that my intention was to take a drink of water. I could have said, I'm going to drink water now, and taken a drink, but you infer it from my conduct. That is the way we do things in life. None of us can see inside someone's brain. That is the way you infer someone's conduct. And that is the jury's job. You are supposed to make reasonable inferences and infer what his conduct was at the time of the crimes."
Again, we consider the remarks in the context of the entirety of the prosecutor's remarks on intent. The example the prosecutor used-of inferring from her act of drinking water that she intended to drink water-was simply to illustrate to the jurors the general principle that intent may be inferred from conduct. That principle is one that is well established. See, e.g., State v. Hedge , 297 Conn. 621, 657, 1 A.3d 1051 (2010) ("[D]irect evidence of the accused's state of mind is rarely available.... Therefore, intent is often inferred from conduct ... and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." [Internal quotation marks omitted.] ) The remarks were not improper.
B
Invitations to Jury To Draw Speculative Inferences
The defendant next claims that the prosecutor improperly urged the jury to draw speculative inferences for which, the defendant claims, there was no support in the record. The defendant points to several instances of this alleged impropriety: a reference to "incriminating" physical evidence; speculation as to whether the defendant believed he could trust those he sought out after the shooting; and speculation as to both his purpose in taking his son to the hospital and his reason for leaving the hospital before J arrived.[31] The *945 state responds that these arguments properly urged the jury to draw inferences from the evidence in the record. We agree with the state.
The defendant claims that the following statement improperly constituted speculation regarding the existence of "incriminating" physical evidence that had not been presented to the jury. Specifically, the defendant relies on the prosecutor's statement that the reason that the defendant had gone to Cortez' home after the shooting and burned his clothing was in order to "get rid of his clothing, which, obviously, must have had incriminating evidence on it ...." Defense counsel objected to the remark on the ground that there was no evidence in the record that the police had recovered any incriminating evidence from the remnants of the defendant's burned clothing. We agree with the prosecutor's response, that the jury reasonably could infer the defendant's state of mind from his actions, namely, that he desired to destroy any incriminating evidence. The remark did not constitute improper speculation or reference to facts not in evidence.
The defendant also claims that the prosecutor improperly speculated regarding possible explanations for the defendant's observed, strange facial expressions after the shooting, as testified to by various witnesses, including Cortez. Specifically, the prosecutor addressed Cortez' testimony that the defendant's eyes were "wide open" and "staring." The prosecutor suggested that the jurors could ask themselves "whether this look reflected whether or not he was trying to decide whether or not to trust her enough to tell her what he [had] done." A reasonable reading of the prosecutor's remarks is that she was offering the jurors one possible reasonable inference that they could draw from the circumstances-that the defendant was staring at Cortez because he was trying to determine whether he could trust her. Defense counsel offered a different explanation in his closing argument, premised on a different set of inferences: the defendant's facial expressions were a sign of his extreme emotional disturbance. The state reasonably and properly presented alternative inferences that the jury could draw from that testimony.
We similarly conclude that the prosecutor's statements regarding the defendant's possible reasons for taking his son to the hospital with him after the shooting, and for leaving before J arrived, were not improper. First, regarding the defendant's reason for going to the hospital, the prosecutor offered the following: "Why do you think that is, ladies and gentlemen? Because he's there to check on the status of his victims to see if they're dead or alive." The prosecutor's remark was supported by evidence in the record-Bolling testified that the defendant had told her that before he went to her house, he had gone to the hospital to see if "whoever" he had shot was dead. The argument properly asked the jury to draw an inference from evidence that was in the record. Second, as to the defendant's reason for leaving the area outside the emergency department entrance before J arrived, the prosecutor offered this possible explanation *946 for the jury's consideration: "Did he get nervous because they took too long? Did a police officer happen by? Did he overhear some conversation from people in the emergency room that would have led him to believe ...." Once again, the prosecutor's remarks suggested reasonable inferences that the jury properly could draw from the evidence, namely, that having shot the three victims, the defendant understandably would be anxious about the possibility of being caught while he was at the hospital where he believed that at least one, and perhaps more, of the victims had been taken. The remarks were not improper.
C
Prosecutor's Suggestion that Disputed Matters Were Resolved and Opinion Regarding Defendant's Guilt and Credibility of Witnesses
The defendant next claims that the prosecutor improperly suggested that certain disputed facts had been resolved and also expressed her opinion as to his guilt and the credibility of the state's witnesses. Specifically, the defendant claims that the prosecutor improperly used the phrases "you know" and "we know" to introduce the state's version of the evidence, vouched for the credibility of Diana Thomas by adopting her account of events, despite the fact that Thomas' testimony conflicted with that of other witnesses to the shooting, and referred to the defendant as a murderer and to the shooting as murders.[32]
The defendant identifies multiple instances in which the prosecutor used the phrases "we know" and "you know" during her closing argument. Without providing any analysis of the specific context and circumstances in which the prosecutor used these phrases, the defendant contends that their use was improper because those phrases conveyed the opinion that the matter was undisputed. The defendant suggests that these phrases are categorically improper and effectively suggests that we should adopt a per se rule that their usage establishes prosecutorial impropriety. We disagree. As the state points out, with one exception, the prosecutor used these phrases to introduce her discussion of specific evidence for the jury's consideration. For example, when discussing the defendant's use of the gun, the prosecutor stated: "We know he had it with him at the moment in time when he was talking to [L] and he had it concealed ... in his clothing. And we know that he had with him enough ammunition to reload. And we know that the gun was fully loaded initially, because he fired five times without having to reload." The prosecutor merely used the phrases to introduce her statements marshaling the evidence for the jury. Used in this manner, the phrases were not improper.
The defendant also claims that the prosecutor improperly vouched for Thomas by summarizing her account of what Thomas observed on the night of the shooting. Specifically, Thomas was the only witness who testified that the defendant shook Carolyn after he shot her the second time. The prosecutor stated: "She's on her hands and knees crawling into the door at the time, and he puts the gun to the back of her head and kills her. He then *947 shook her. That is the testimony of Diana Thomas. He shook her. He's only shaking her for one reason; to see if she was dead. He wasn't shaking her to say, are you all right? He's shaking her to see if she is dead. Carolyn is playing dead." The defendant suggests that it was improper for the prosecutor to recount Thomas' recollection that she saw the defendant shake Carolyn because Carolyn did not claim that he had shaken her. The prosecutor is not required to limit her argument to the testimony that favors the defendant or to testimony that is undisputed. The prosecutor was simply marshaling the evidence, and her statements were not improper.
The defendant next points to the prosecutor's statement during rebuttal: "So, ladies and gentlemen, you have all those things to look at. Fleeing the scene, destroying evidence, checking on the status of his victims, [to] see if they're dead or alive-oh, and by the way, [defense counsel] says, well, why would he take that risk? Murderers take risks, ladies and gentlemen. He needed to know if these people were going to be able to be sticking around to be witnesses or whether he had successfully accomplished his task. Murderers take risks."
The defendant claims that these remarks improperly characterized him as a murderer, despite the fact that he had not yet been convicted. He contends that the stigma is significant because he had asserted an affirmative defense of extreme emotional disturbance, which, if established, would have resulted in a conviction of manslaughter rather than capital felony.
This court repeatedly has held comments such as these to be improper. We have explained: "It is no part of a [prosecutor's] duty, and it is not his right, to stigmatize a defendant. He has a right to argue that the evidence proves the defendant guilty as charged in the indictment, but for the [prosecutor] himself to characterize the defendant as a cold-blooded killer is something quite different. No [defendant] on trial for murder can be officially characterized as a murderer or as a cold-blooded killer, until he is adjudged guilty of murder or pleads guilty to that charge." (Internal quotation marks omitted.) State v. Thompson , 266 Conn. 440, 472, 832 A.2d 626 (2003) ; see also State v. Couture , 194 Conn. 530, 561-64, 482 A.2d 300 (1984) (prosecutor's remarks characterizing defendants as " 'murderous fiends' " and " 'utterly merciless killers' " were improper), cert. denied, 469 U.S. 1192, 105 S.Ct. 967, 83 L.Ed. 2d 971 (1985).
Even if the prosecutor's comments were improper, the defendant would not be able to establish prejudice. The evidence that the defendant shot and killed L and Desiree was overwhelming. By contrast, as we explain in part XIII of this opinion, the evidence that the defendant offered in support of his affirmative defense of extreme emotional disturbance was weak, at best. Accordingly, this claim fails.
D
Prosecutor's Comment on Defendant's Failure To Testify
The defendant next claims that the prosecutor improperly commented on his failure to testify when she argued in her rebuttal that he had failed to prove his affirmative defense of extreme emotional disturbance. The defendant claims that the same remarks also improperly suggested that the jury, in determining whether he had met his burden of proving extreme emotional disturbance, was permitted to consider only evidence offered by the defense. Specifically, the prosecutor pointed out that the defense had failed to offer any evidence that "[the defendant] had ever previously been prohibited from having contact with his son.... They provided you with no information indicating he even wanted to have contact with his son. They *948 provided you with no information as to how often he ever visited his son, if at all.... And we know that when he got his protective order, he certainly didn't make any complaints to the judge, so you have no information telling you that this was an extremely unusual and overwhelming state." Nothing in these remarks constitutes a comment-even indirectly-on the defendant's failure to testify. The prosecutor's remarks simply pointed out to the jury gaps in the defendant's case as to his affirmative defense of extreme emotional disturbance, which he bore the burden to prove. For the same reason, we disagree with the defendant that the prosecutor's remarks suggested to the jury that it was limited to evidence offered by the defense in evaluating the defendant's extreme emotional disturbance defense. The mere fact that the state pointed to the defendant's failure to close gaps in the evidence does not amount to an improper suggestion that the jury could not consider evidence that had been presented by the state. The remarks focused on the failure of the defendant to present evidence regarding what had caused the extreme emotional disturbance and, therefore, were not improper.[33]
XV
DEFENSE COUNSEL CONFLICT OF INTEREST
The defendant seeks Golding review of his claim that the trial court improperly failed to make any inquiry into whether his right to counsel was jeopardized by a potential conflict of interest. The defendant claims that his interests were in conflict with the interests of another criminal defendant, Troy Westberry, who was represented by the Hartford public defender's office, which is where Smith, one of the defendant's attorneys, worked. The defendant argues, therefore, that the trial court should have inquired regarding any ongoing duty that Smith owed to Westberry that potentially could conflict with the duty that Smith owed to the defendant. Because the defendant has failed to present an adequate record for review, his claim fails on the first prong of Golding . See State v. Golding , supra, 213 Conn. at 239, 567 A.2d 823.
The following additional facts are relevant to our resolution of this claim. In May, 2000, the defendant testified as an eyewitness for the state in the murder prosecution of Westberry for a drive-by shooting on Albany Avenue in Hartford. The prosecutor in that case was Vicki Melchiorre, who was lead counsel for the state in the present case. On January 5, 2004, the defendant filed a motion to disqualify Melchiorre and the entire Hartford Office of the State's Attorney from prosecuting *949 the present case.[34] In that motion, the defendant argued that Melchiorre was a potential mitigation witness in the penalty phase because she would be able to testify as to the defendant's cooperation in the Westberry trial. The defendant raised two additional reasons in support of his claim that Melchiorre should be disqualified. Specifically, he stated that, during the Westberry trial, Melchiorre held meetings with both the defendant and L at the same time, despite having actual or constructive knowledge of a protective order barring the defendant from having contact with L. The defendant also contended that Melchiorre was biased against him as a result of personal knowledge that she gained about him during the Westberry trial.
During the hearing on the motion, the court gave the defendant the opportunity to make an offer of proof in support of his claim that Melchiorre should be disqualified. In response, the defendant asserted that he needed information from Melchiorre, such as the details of the housing that had been provided to him after the Westberry trial as part of the witness protection and relocation services and the number of meetings with Melchiorre at which L was present with the defendant. When the court inquired in what capacity the defendant sought to have Melchiorre testify for the defense, the defendant responded that she would be able to offer mitigation evidence by testifying as to his cooperation in the Westberry case. The trial court denied the motion to disqualify on the basis of its conclusion that the defendant had failed to demonstrate a compelling need to place Melchiorre on the witness stand.
The defendant claims that the information that he presented during the hearing on the motion to disqualify Melchiorre should have alerted the trial court of the need to inquire as to whether Smith owed conflicting duties to Westberry and the defendant. The defendant claims that, if the court had so inquired, it would have discovered that Smith was an assistant public defender with the Hartford public defender's office, both at the time that the defendant testified at the Westberry trial on May 11, 2000, and during the course of his representation of the defendant. The defendant asserts that the court also would have discovered that Westberry was represented by an assistant public defender, Kevin Barrs, whose trial strategy included impeaching the defendant's credibility. Although the defendant originally claimed that the record demonstrated that Barrs was a member of the Hartford public defender's office, he later conceded in his reply brief that the record demonstrates only that Barrs was an assistant public defender who appeared in the case, which was being prosecuted in the Hartford judicial district. The defendant suggests that we may infer from Barrs' appearance in the case that he worked with the Hartford public defender's office. The state, however, points to evidence in the record that demonstrates that, at least at the time of the defendant's trial, Barrs was with the public defender's office in New London. The record, therefore, is unclear as to whether-and if so, when-Barrs was a member of the Hartford public defender's office. The record also reflects that Westberry's trial occurred in 2000. Westberry's direct appeal was rejected by the Appellate Court before the commencement of the defendant's case. See State v. Westberry , 68 Conn. App. 622, 792 A.2d 154, cert. denied, 260 Conn. 923, 797 A.2d 519 (2002).
*950 Finally, although the record reflects that Westberry filed a habeas petition, nothing in the record confirms whether the Hartford public defender's office represented Westberry in that habeas action.
The defendant's claim that Smith had a conflict of interest rests on the contention that Smith owed an ongoing duty to Westberry on the basis that Westberry was represented by the Hartford public defender's office, where Smith worked. Because the defendant has failed to point to evidence in the record that conclusively establishes that Westberry was represented by the Hartford public defender's office at any time, and, particularly, at the time of the defendant's trial, he has failed to present an adequate record for review, and his claim fails on the first prong of Golding . See State v. Golding , supra, 213 Conn. at 239, 567 A.2d 823.[35]
XVI
CUMULATIVE ERROR
Finally, we observe that it is unnecessary to address the defendant's claim that this court should adopt the federal cumulative error rule. We recently explained that doctrine, observing that "[f]ederal case law in which the cumulative unfairness doctrine ... has required reversal of a conviction essentially seems to fall into one or more of the following categories: (1) the errors directly related to and impacted an identified right essential to a fair trial, i.e., the right to a presumption of innocence or the right to present witnesses in one's own defense; (2) at least one of the errors was so significant as to render it highly doubtful that the defendant had received a fair trial and the remaining errors created the additional doubt necessary to establish that there was serious doubt about the fairness of the trial, which is necessary to reverse a conviction; or (3) the errors were pervasive throughout the trial." (Citation omitted; internal quotation marks omitted.) Hinds v. Commissioner of Correction , 321 Conn. 56, 95, 136 A.3d 596 (2016). In the present case, just as in Hinds , we conclude that, "even if we were to recognize the cumulative error doctrine as articulated in the federal courts ... the trial improprieties in the present case would not justify relief under that doctrine." Id.
The appeal is dismissed with respect to the defendant's claims regarding the penalty phase and the sentence of death; the judgment is affirmed in all other respects.
In this opinion the other justices concurred.

Unless otherwise noted, all subsequent references to §§ 53a-54b (8) and 53a-217c (a) (1) are to the 1999 revision of the General Statutes.

L and her son were the subject of protective orders that had been issued against the defendant. In furtherance of our policy of protecting the privacy interests of the subjects of a criminal protective order, we refer to the protected persons and to members of their family only by their first initials. See, e.g., Wendy V. v. Santiago , 319 Conn. 540 n.*, 125 A.3d 983 (2015).

"Dust" is a street name for phencyclidine, also known as PCP.

General Statutes § 18-10b provides in relevant part: "(a) The Commissioner of Correction shall place an inmate on special circumstances high security status and house the inmate in administrative segregation until a reclassification process is completed under subsection (b) of this section, if ... (2) the inmate is in the custody of the Commissioner of Correction for a capital felony committed prior to April 25, 2012, under the provisions of section 53a-54b in effect prior to April 25, 2012, for which a sentence of death is imposed in accordance with section 53a-46a and such inmate's sentence is (A) reduced to a sentence of life imprisonment without the possibility of release by a court of competent jurisdiction, or (B) commuted to a sentence of life imprisonment without the possibility of release.
"(b) The commissioner shall establish a reclassification process for the purposes of this section. The reclassification process shall include an assessment of the risk an inmate described in subsection (a) of this section poses to staff and other inmates, and an assessment of whether such risk requires the inmate's placement in administrative segregation or protective custody. If the commissioner places such inmate in administrative segregation pursuant to such assessment, the commissioner shall require the inmate to complete the administrative segregation program operated by the commissioner.
"(c) (1) The commissioner shall place such inmate in a housing unit for the maximum security population if, after completion of such reclassification process, the commissioner determines such placement is appropriate, provided the commissioner (A) maintains the inmate on special circumstances high security status, (B) houses the inmate separate from inmates who are not on special circumstances high security status, and (C) imposes conditions of confinement on such inmate which shall include, but not be limited to, conditions that require (i) that the inmate's movements be escorted or monitored, (ii) movement of the inmate to a new cell at least every ninety days, (iii) at least two searches of the inmate's cell each week, (iv) that no contact be permitted during the inmate's social visits, (v) that the inmate be assigned to work assignments that are within the assigned housing unit, and (vi) that the inmate be allowed no more than two hours of recreational activity per day. (2) The commissioner shall conduct an annual review of such inmate's conditions of confinement within such housing unit and the commissioner may, for compelling correctional management or safety reasons, modify any condition of confinement, subject to the requirements of subparagraphs (A) to (C), inclusive, of subdivision (1) of this subsection...."

We emphasize that the defendant's penalty phase claims are not ripe only to the extent that they may be relevant to a potential challenge to the defendant's conditions of confinement. Insofar as the defendant's penalty phase claims seek to have his sentence of death reversed, those claims have been rendered moot by this court's decisions in State v. Santiago , supra, 318 Conn. at 1, 122 A.3d 1, and State v. Peeler , supra, 321 Conn. at 375, 140 A.3d 811.

The defendant subsequently filed a motion for rectification of the trial court record, seeking to make a complete record of what transpired at the two unrecorded scheduling conferences. The trial court denied that motion following a hearing.

The defendant also asserts that the denial of the motions for continuances deprived him of the effective assistance of counsel. The defendant asserts that his claim is reviewable on direct appeal because his claim is distinguishable from one relying on Strickland v. Washington , 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984), because it does not require further evidentiary development. We disagree. The defendant has not proven that his defense counsel would have done anything different if they had been given more time for voir dire and trial preparation. He has not demonstrated that their performance was deficient, and such a showing would require the presentation of evidence. The defendant's ineffective assistance claim is precisely the type of collateral attack that is best resolved in a habeas action, where the defendant will have the opportunity to present evidence in support of his claim that his counsel's performance was deficient and that he was prejudiced by that deficient performance.
We also reject the defendant's contention that his claim presents a pure question of law, reviewable on direct appeal pursuant to State v. Arroyo , 284 Conn. 597, 643-45, 935 A.2d 975 (2007). That decision discussed a very narrow exception to the general rule that a habeas petition is the appropriate vehicle for a claim of ineffective assistance of counsel. Specifically, we observed in Arroyo : "On the rare occasions that we have addressed an ineffective assistance of counsel claim on direct appeal, we have limited our review to allegations that the defendant's sixth amendment rights had been jeopardized by the actions of the trial court , rather than by those of his counsel.... We have addressed such claims, moreover, only where the record of the trial court's allegedly improper action was adequate for review or the issue presented was a question of law, not one of fact requiring further evidentiary development." (Emphasis in original; internal quotation marks omitted.) Id., at 644, 935 A.2d 975. Because the defendant's claim would require further evidentiary development-namely, to allow the defendant to present evidence that the denial of the continuances affected his counsel's ability to represent him-Arroyo is inapplicable to the present case.
The defendant also claims that the trial court's denial of his motions seeking continuances rendered his counsel ill-prepared to preserve his appellate rights. Accordingly, the defendant contends, even if this court concludes that one or more of his claims are unpreserved, we should address those claims. The defendant appears to suggest that had he been granted the continuances, his counsel would have preserved all appellate claims. The defendant offers no evidence to support this speculation. We further observe that the defendant's argument simply recasts an ineffective assistance of counsel claim in an attempt to secure review of unpreserved claims. Just as with any other collateral attacks that are based on ineffective assistance of counsel claims, the defendant's remedy for his claim that his counsel were ineffective for failing to preserve claims on appeal is to file a petition for a writ of habeas corpus.

The A.B.A. guideline provides in relevant part: "The Legal Representation Plan should provide for assembly of a defense team that will provide high quality legal representation.... The defense team should consist of no fewer than two attorneys qualified in accordance with Guideline 5.1, an investigator, and a mitigation specialist." A.B.A., Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (February 2003) guideline 4.1 (a) (1), reprinted in 31 Hofstra L. Rev. 913, 952 (2003).
The policy of the Public Defender Services Commission provided: "It is the policy of the Public Defender Services Commission that two lawyers be appointed to represent any defendant charged with a capital felony when the state intends to seek the death penalty and that both lawyers should appear with and participate in the representation of the defendant at all contested pretrial proceedings, all voir dire proceedings, and all trial proceedings, unless such appearance by both lawyers is waived by the defendant after consultation with counsel."

The defendant takes issue with the applicable standard of review and argues that, because the trial judge subsequently acknowledged that he allowed a juror to be seated on the panel despite the judge's belief that the juror had concealed her opposition to the death penalty, no deference should be given to the trial judge's failure to preclude the jurors at issue in this appeal from being seated. We reject the defendant's argument, which appears to suggest that the judge was biased. Even if we agreed with that suggestion, the cited remarks would provide support for the conclusion that the judge's bias was in the defendant's favor. Because we reject the defendant's argument in favor of a different standard of review, we frame the issue as though the defendant had relied on the correct standard in making his argument.

The defendant also challenges the court's finding during the penalty phase, after a second competency hearing, that he was competent to stand trial. As we explain in part I of this opinion, we do not address the defendant's penalty phase challenges.

In his brief, the defendant suggests that the trial court's purported misapplication of the governing legal standard rendered the court's ultimate determination that he was competent "clearly erroneous." Review for clear error, however, applies to a trial court's factual findings. That standard of review is not relevant to our consideration of the defendant's claims, which raise a legal question and are subject to plenary review. See, e.g., State v. Skipwith , 326 Conn. 512, 518, 165 A.3d 1211 (2017) (plenary review applies to questions of law).

The defendant reported to Zonana that he had suffered head injuries twice in the past, once during a motor vehicle accident and once when he was hit in the back of the head with a gun.

The defendant relies on this court's decision in Lapointe v. Commissioner of Correction , 316 Conn. 225, 310-11, 112 A.3d 1 (2015), for the proposition that a less deferential application of the clearly erroneous standard of review is appropriate in reviewing the trial court's credibility findings. We disagree that Lapointe applies to the facts of the present case.

The defendant also claims that § 53a-54b is impermissibly vague under the eighth amendment to the United States constitution, arguing that the statutory language is not sufficiently precise to provide a "principled basis" for distinguishing those cases in which the death penalty was assessed and those cases in which it was not. See Bell v. Cone , 543 U.S. 447, 459, 125 S.Ct. 847, 160 L.Ed. 2d 881 (2005). As we explain in part I of this opinion, however, the defendant's claims challenging the imposition of the death penalty are not ripe. Accordingly, we do not address this claim.

We reject the defendant's suggestion that the two murders were not committed "at the same time" because L and Desiree were killed by "distinct gunshots." Nothing in the language of the statute suggests that "at the same time" means "with the same bullet." Because we conclude that the murders need not be simultaneous and the victims need not have been killed by the same gunshot in order to fall within the ambit of § 53a-54b (8), we reject the defendant's claim that the trial court improperly referred to the plural, "murders," rather than using the singular, "murder," in its instructions to the jury on the elements of capital felony. The trial court's use of the plural was proper, as was its instruction that the jury needed to find that the murders occurred at "approximately the same time."
We also reject the defendant's claim that, because State v. Ferguson , 260 Conn. 339, 796 A.2d 1118 (2002), was decided after he committed the murders in the present case, we may not rely on our interpretation of § 53a-54b (8) in that case to resolve his claim in this appeal. Nothing about our reading of § 53a-54b (8) in Ferguson involved an "unexpected" or "indefensible" reading of § 53a-54b (8) that would preclude retroactive application. See State v. Courchesne , supra, 296 Conn. at 724, 998 A.2d 1 ("[i]f a judicial construction of a criminal statute is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue, [the construction] must not be given retroactive effect" [internal quotation marks omitted] ).

The defendant challenges the trial court's instructions on the elements of capital felony because the court mistakenly charged that, in order to find that he murdered the victims "at the same time or in the course of a single transaction," the jury was required to find that there was a "plan, motive or event common to both murders." (Emphasis added.) That is, the court's instruction incorrectly substituted the word "event" for "intent." Viewing the erroneous language in the context of the overall charge; State v. Aviles , 277 Conn. 281, 309-10, 891 A.2d 935, cert. denied, 549 U.S. 840, 127 S.Ct. 108, 166 L.Ed. 2d 69 (2006) ; we conclude that it was not reasonably possible that the incorrect substitution misled the jury. The court also instructed the jury: "In order to prove that the murders occurred at the same time or in the course of a single transaction, the state must prove beyond a reasonable doubt that the murders occurred at approximately the same time or that the murders were related to a single course of conduct or plan carried out as a series of events with a clear connection." With the exception that the court's instruction omitted one of the possible connections-intent-it properly set forth the jury's required inquiry, consistent with this court's decision in State v. Gibbs , supra, 254 Conn. at 603-605, 758 A.2d 327. If anything, accordingly, because the court's instruction omitted a possible connection on which the jury could have relied to find that the state had proven that the murders were committed in the course of a single transaction, the error benefited the defendant.
We also reject the defendant's claim that the trial court's capital felony instruction sanctioned a nonunanimous verdict. The defendant argues that the court's instructions, which charged the jury that in order to find him guilty of capital felony, "you must unanimously find that the state has proven beyond a reasonable doubt that the defendant murdered two persons, [L] and [Desiree], and those murders occurred at the same time or in the course of a single transaction." The defendant argues that the court's instruction suggested that the jurors need not be unanimous as to which of the two alternatives they had found. The defendant's argument lacks merit-nothing in the trial court's instruction sanctioned a verdict that was not unanimous. See State v. Famiglietti , 219 Conn. 605, 619-20, 595 A.2d 306 (1991).

Because we conclude that the statutory language plainly and unambiguously applies to the defendant's conduct, we need not address the defendant's argument that the legislative history of § 53a-54b (8) supports his claim that the statute is unconstitutionally vague as applied to his conduct. See General Statutes § 1-2z.

The defendant's motion for a judgment of acquittal also claimed that there was insufficient evidence to support his conviction of assault in the first degree in violation of § 53a-59 (a) (1) and criminal possession of a pistol or revolver in violation of § 53a-217c (a) (1). The defendant does not pursue those claims in this appeal.

The prior protective order was not introduced into evidence.

Because we conclude that the defendant's intent to kill Desiree at the time that he fired the first shot at her may be inferred from the fact that he shot her a second time within seconds after the first shot, we need not address the defendant's argument that the evidence was insufficient because it was possible that the defendant killed Desiree with the first shot, at which time, he contends, he was acting with a reckless intent, and not with the intent to kill. The defendant produced no evidence, however, that he acted with a reckless intent when he shot Desiree the first time. As we have explained, the state produced overwhelming evidence to the contrary, proving that he methodically and efficiently chased the two eyewitnesses down and shot each of them twice, shooting each of them in the head. The defendant cannot rely on speculation to prevail on a claim that the state produced insufficient evidence of his intent to kill the victims.

The state argues that the defendant's evidentiary claim is unpreserved and not reviewable because "(1) before the trial court, he did not properly object to the evidence he challenges on appeal, and (2) on appeal, he does not challenge the alternative basis on which the trial court admitted the evidence."

We reject the defendant's claim that the prior misconduct evidence was not admissible as motive evidence because it lacked a causal connection to the charged conduct. This court has never imposed such a requirement. See, e.g., State v. Pena , supra, 301 Conn. at 675, 22 A.3d 611 (upholding trial court determination that prior misconduct evidence about possession of firearm was relevant to charged shooting, without requiring causal connection).

The defendant claims that, because the state did not argue that the prior misconduct evidence was relevant to prove identity, the trial court improperly instructed the jury that it could consider the misconduct evidence for that purpose. This argument lacks merit. Although the state proffered the prior misconduct evidence on the ground that it was relevant to prove motive, the trial court's ruling was provisional in nature. The court ruled that relevance was "going to have to be established by tying it up" with additional witness testimony. The trial court's initial ruling aligns with § 1-3 (b) of the Connecticut Code of Evidence, which provides that, "[w]hen the admissibility of evidence depends upon connecting facts, the court may admit the evidence upon proof of the connecting facts or subject to later proof of the connecting facts."
We also reject the defendant's suggestion that the trial court was somehow barred from instructing the jury that the prior misconduct evidence was relevant to prove identity and means, rather than motive, on which the state had relied. The court was well within its discretion to determine the purpose for which the evidence was relevant. The defendant's reliance on State v. Cutler , 293 Conn. 303, 314-15, 977 A.2d 209 (2009), and State v. Ruffin , 48 Conn. App. 504, 506-507, 710 A.2d 1381, cert. denied, 245 Conn. 910, 718 A.2d 18 (1998), for this argument is misplaced. Neither of those decisions forbids a trial court to instruct the jury to consider evidence for purposes other than those for which it was offered. Both cases merely involved a trial court's instruction that limited the jury's consideration of prior misconduct evidence to the purposes for which it was relevant. See State v. Cutler , supra, at 315, 977 A.2d 209 ; State v. Ruffin , supra, at 508, 710 A.2d 1381.

Because we conclude that the trial court balanced the prejudice and probative value of the prior misconduct evidence, we need not address the defendant's argument to the contrary.

The parties disagree as to whether the defendant's instructional challenge is properly before us, and each has offered arguments as to whether the defendant preserved the claim. We determine, however, that even if we assume, without deciding, that the instructional challenge is properly before us, the defendant cannot prevail on the merits. It is therefore unnecessary for us to detail in this opinion the complex procedural posture and attendant arguments regarding preservation raised by both parties. We also decline to address the defendant's request that we overrule our decision in State v. Kitchens , 299 Conn. 447, 10 A.3d 942 (2011).

The trial court instructed the jury: "Our statute on the affirmative defense of extreme emotional disturbance, insofar as it applies in this case, provides that, [in] any prosecution for murder, quote, it shall be an affirmative defense that the defendant acted-acted under extreme-excuse me-under the influence of extreme emotional disturbance, for which there was a reasonable explanation or excuse, the reasonable[ness] of which is to be determined from the viewpoint of the person-of a person in the defendant's situation under the circumstances as the defendant believed them to be, end quote. This statute, then, means that, when a person is charged with murder, the jury may, under appropriate circumstances, find him guilty of the lesser included offense of manslaughter in the first degree by reason of extreme emotional disturbance, rather than guilty of murder.
"This affirmative defense of extreme emotional disturbance is a defense to the charge of murder. But it does not result in a verdict of not guilty. It results instead in a verdict of guilty of extreme emotional disturbance, manslaughter, in the first degree with a firearm. Thus, it reduces the crime of murder to the crime of extreme emotional defense manslaughter in the first degree with a firearm. This affirmative defense relates to the defendant's state of mind at the time, if you find that he killed the victims [L] and [Desiree]. If you have simultaneously found that the state has so proven beyond a reasonable doubt those murders. You will recall that one of the elements of the crime of murder is that the actor intended to cause the death of another person. Extreme emotional disturbance does not negate, it does [not] wipe out that intent. It serves merely to explain reasonably the circumstances leading to the formation of that intent. Its purpose is to render the actor less culpable, less blameworthy, because his intentional acts were caused by extreme emotional disturbance."
After the court instructed the jury that the defendant bore the burden to prove the affirmative defense of extreme emotional disturbance by a preponderance of the evidence, it gave the jury guidelines for determining whether the defendant had met his burden: "There are two elements to this affirmative defense: One, the defendant was exposed to an extremely unusual and overwhelming state, that is, more than mere annoyance or unhappiness, and the defendant had an extreme emotional reaction to the state, as a result of which, there was a loss of self-control, and his reason was overborne by intense feelings such as, passion, anger, distress, grief, excess agitation, or other similar emotions. You should give consideration to whether the intensity of these feelings was such that the defendant's usual intellectual controls failed, and that his normal rational thinking no longer prevailed at the time of the act. It is used in this affirmative defense, the word, quote, extreme, unquote, means the greatest degree of intensity. Away from the norm. Away from the normal or usual state for the defendant.
"If you find the defendant acted under extreme emotional disturbance, I have defined that term for you, you must also find in order for the affirmative defense to be established that there was a reasonable explanation or excuse for this disturbance, the reasonable in which-the reasonableness of which is to be determined from the viewpoint of the defendant's situation under the circumstances that the defendant believed them to be. The reasonableness of the defendant's conduct under extreme emotional disturbance is to be determined from the viewpoint of the defendant's situation under the circumstances as he believed them to be."

We observe, however, that nothing in the trial court's instructions suggested that the defendant was required to prove that his extreme emotional disturbance resulted from a sudden trigger. The present case is therefore distinguishable from State v. Elliott , supra, 177 Conn. at 4, 411 A.2d 3, in which the court incorrectly charged the jury on the " 'heat of passion' " defense, rather than the extreme emotional disturbance defense.
The defendant argues that, notwithstanding the absence of language in the trial court's charge to the jury that ruled out a "simmering" extreme emotional disturbance, remarks in the prosecutor's closing argument suggested that the defendant was required to prove a heat of passion defense. Specifically, in rebuttal, the prosecutor noted that Carolyn had testified that, immediately prior to the shooting, L and the defendant were not "screaming," "yelling," or "arguing." We disagree with the defendant that this observation rules out a "simmering" extreme emotional disturbance defense. Carolyn's testimony, as recounted by the prosecutor, was directly relevant to the point that the prosecutor was making at the time-she was arguing that the defendant was not under an extreme emotional disturbance at the time of the shooting . She cited to his calm demeanor immediately prior to the shooting as evidence of the lack of extreme emotional disturbance at the time.
We also observe that defense counsel made a very similar point during closing argument, stating: "You can't speculate, but you can consider all those things, and you know that something happened in his mind, which snapped. And that was described by [Carolyn]. Because he went from being-having a conversation with [L], to all of a sudden pulling out a gun." Defense counsel's reliance on this piece of evidence to argue that the defendant must have been under the influence of an extreme emotional disturbance at the time of the shooting belies the claim that the state's reliance on the same piece of evidence rendered it likely that the trial court's omission of the "simmering" language misled the jury.

In addition to evidence adduced at trial, the defendant also points to the trial court's observation, when it determined to give the instruction, that at the competency hearing, questions had been raised regarding the defendant's mental status. Because evidence at the competency hearing was not presented before the jury at trial, however, that evidence is not relevant to the question of whether the defendant established his defense of extreme emotional disturbance, and we do not consider it.

The defendant's remaining instructional challenges-that, in its instructions, the trial court improperly marshaled the evidence in favor of the state's theories of intent and consciousness of guilt; that the court improperly refused to instruct the jury that, if the evidence in the case reasonably permitted two conclusions, one consistent with guilt, the other with innocence, the jury must draw the inference consistent with innocence; and that the trial court improperly gave an acquit first instruction-are without merit, and we decline to address them or the preservation arguments raised by the parties with respect to each instructional challenge.

The defendant originally had also claimed that the alleged prosecutorial improprieties rendered his conviction insufficiently reliable to serve as the basis for a death sentence. As we explain in part I of this opinion, the issue of whether the defendant's penalty phase challenges are moot is not ripe. Accordingly, we address only the defendant's claim that the alleged prosecutorial improprieties violated his due process right to a fair trial.

The defendant also takes issue with the prosecutor's response, in her rebuttal, to defense counsel's remarks in closing argument that suggested that Desiree had fallen to the ground when she sustained the gunshot wound to her chin, and, therefore, she was already dead when he shot her the second time. This argument was in support of the defendant's theory that he did not have the requisite intent to kill when he fired the first shot, which he claims killed Desiree, and he cannot be held liable for having that intent when he fired the second shot because she was already dead at that point. First, as we explain in footnote 20 of this opinion, we conclude that the defendant's intent at the time that he fired the first shot may be inferred from the fact that he shot her twice. Accordingly, the question of which shot killed her was not relevant to his intent. Second, the prosecutor did not speculate but merely stated that the evidence was inconclusive as to which shot killed Desiree, and that the answer to the question did not have any bearing on the defendant's intent.

The defendant also takes issue with the prosecutor's statement in closing argument that Desiree likely put her hand up in front of her as the defendant shot her the first time. The defendant claims this statement referred to facts not in evidence. As we explained in part VII of this opinion, that fact was in evidence. Carver, the state's expert, testified that the likely trajectory of the first bullet fired at Desiree was through her forearm, which she was likely holding out in front of her, then her breast, and finally her chin.

The defendant also claims that the prosecutor improperly referred to facts not in evidence in a misleading manner. During his closing argument, in support of the defendant's defense of extreme emotional disturbance, defense counsel referred to the protective order that was issued as a result of the defendant's arrest two days prior to the shooting. He also referenced a previously issued protective order, one that had not been introduced into evidence, for the proposition that the relationship between the defendant and L "had issues going on." At that point, the prosecutor objected, arguing: "There was no testimony indicating that protective order was issued [as] to [L]. That could be involving a totally different person." The defendant now claims that it was improper for the prosecutor to suggest in her objection that the defendant could have had a protective order issued against him as to another, unidentified person. Even if we were to conclude that the prosecutor's comment was improper, it was invited by defense counsel's reference to facts not in evidence. The prosecutor's remark, moreover, merely stated, accurately, that there had been no testimony that the protective order related to L.

The defendant has appealed from the trial court's denial of his motion to disqualify the prosecutor. Because, however, the defendant's claim is that the court's refusal to disqualify the prosecutor relates to the penalty phase, we do not address that claim. See part I of this opinion.

The defendant also alleges that the trial judge's actual and apparent bias and inappropriate behavior required him to recuse himself sua sponte and that the failure to do so denied the defendant of due process. Virtually all of the defendant's claims are predicated on the trial judge's alleged bias and inappropriate behavior during the penalty phase. As we have explained in part I of this opinion, the defendant's challenges to the penalty phase are not ripe, and we do not address them. To the extent that the defendant's brief may be construed also to allege that judicial bias infected the guilt phase, we deem that issue to be inadequately briefed and decline to address it.